LYNG, SECRETARY OF AGRICULTURE *v.* INTERNA-
TIONAL UNION, UNITED AUTOMOBILE, AERO-
SPACE, & AGRICULTURAL IMPLEMENT
WORKERS OF AMERICA, UAW, ET AL.

No. 86–1471.   Argued December 7, 1987—Decided March 23, 1988

WHITE, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and STEVENS, O'CONNOR, and SCALIA, JJ., joined. MARSHALL, J., filed a dissenting opinion, in which BRENNAN and BLACKMUN, JJ., joined, *post*, p. 374. KENNEDY, J., took no part in the consideration or decision of the case.

*Lawrence S. Robbins* argued the cause for appellant. With him on the brief were *Solicitor General Fried, Assistant Attorney General Willard, Deputy Solicitor General Lauber, William Kanter, John S. Koppel,* and *Mark L. Gross.*

*Richard W. McHugh* argued the cause for appellees. With him on the brief were *Jordan Rossen, Michael Holland, Judith A. Scott,* and *Wendy L. Kahn.**

JUSTICE WHITE delivered the opinion of the Court.

A 1981 amendment to the Food Stamp Act states that no household shall become eligible to participate in the food stamp program during the time that any member of the household is on strike or shall increase the allotment of food stamps that it was receiving already because the income of the striking member has decreased. We must decide whether this provision is valid under the First and the Fifth Amendments.

I

In the Omnibus Budget Reconciliation Act of 1981 (OBRA), Pub. L. 97–35, 95 Stat. 357, Congress enacted a package of budget cuts throughout the Federal Government. Among the measures contained in OBRA were more than a dozen specific changes in the food stamp program, *id.,* §§ 101–117.[1] One of them was the amendment at issue in

---

*\*John A. Powell, Helen Hershkoff, Steven R. Shapiro,* and *C. Edwin Baker* filed a brief for the American Civil Liberties Union Foundation as *amicus curiae* urging affirmance.

[1] Included were such fundamental changes as redefining the requirements to constitute a family unit, reducing the gross income eligibility standard (except for the elderly and the disabled), and adjusting the levels of deductions that are allowed to recipients. §§ 101, 104(a), 105, 106, 115. The Committee Reports estimated that these changes in the food stamp program would save several billion dollars in fiscal years 1982, 1983, and 1984. H. R. Rep. No. 97–158, pp. 11–13 (1981) (hereafter H. R. Rep.); S. Rep. No. 97–139, pp. 52–70 (1981) (hereafter S. Rep.).

this case, § 109 of OBRA, which is set out in the margin.[2] The Committee Reports estimated that this measure alone would save a total of about $165 million in fiscal years 1982, 1983, and 1984. H. R. Rep., at 12; S. Rep., at 63.

In 1984, two labor unions and several individual union members brought suit against the Secretary of Agriculture in District Court, contending that § 109 is unconstitutional and requesting declaratory and injunctive relief. Plaintiffs moved for a preliminary injunction, and the Secretary moved to dismiss the complaint on the grounds that Congress' action was well within its constitutional prerogatives. After a hearing, the District Court denied both motions. 648 F. Supp. 1234, 1241 (DC 1986) (Appendix).

Both sides conducted discovery and filed cross-motions for summary judgment. On November 14, 1986, the District Court granted plaintiffs' motion for summary judgment and issued a declaratory judgment, holding the statute unconstitutional. 648 F. Supp. 1234. Specifically, the District Court found that the amendment to the Food Stamp Act was unconstitutional on three different grounds. First, it interferes or threatens to interfere with the First Amendment rights of the individual plaintiffs to associate with their families, with their unions, and with fellow union members, as

---

[2] "Notwithstanding any other provision of law, a household shall not participate in the food stamp program at any time that any member of the household, not exempt from the work registration requirements . . . is on strike as defined in section 142(2) of title 29, because of a labor dispute (other than a lockout) as defined in section 152(9) of title 29: *Provided,* That a household shall not lose its eligibility to participate in the food stamp program as a result of one of its members going on strike if the household was eligible for food stamps immediately prior to such strike, however, such household shall not receive an increased allotment as the result of a decrease in the income of the striking member or members of the household: *Provided further,* That such ineligibility shall not apply to any household that does not contain a member on strike, if any of its members refuses to accept employment at a plant or site because of a strike or lockout." OBRA, § 109, 95 Stat. 361, 7 U. S. C. § 2015(d)(3).

well as the reciprocal rights under the First Amendment of the union plaintiffs to their members' association with them. Second, it interferes with strikers' First Amendment right to express themselves about union matters free of coercion by the Government. Third, it violates the equal protection component of the Due Process Clause of the Fifth Amendment. As the basis for its conclusion on the equal protection claim, the District Court mentioned several somewhat related deficiencies in the amendment: it betrays an animus against an unpopular political minority, it irrationally treats strikers worse than individuals who quit a job, and it impermissibly directs the onus of the striker's actions against the rest of his family. *Id.*, at 1239–1241. The Secretary appealed the decision directly to this Court under 28 U. S. C. § 1252, and we noted probable jurisdiction. 481 U. S. 1036 (1987). We now reverse.

## II

We deal first with the District Court's holding that § 109 violates the associational and expressive rights of appellees under the First Amendment. These claimed constitutional infringements are also pressed as a basis for finding that appellees' rights of "fundamental importance" have been burdened, thus requiring this Court to examine appellees' equal protection claims under a heightened standard of review. *Zablocki* v. *Redhail*, 434 U. S. 374, 383 (1978). Since we conclude that the statute does not infringe either the associational or expressive rights of appellees, we must reject both parts of this analysis.

## A

The challenge to the statute based on the associational rights asserted by appellees is foreclosed by the reasoning this Court adopted in *Lyng* v. *Castillo*, 477 U. S. 635 (1986). There we considered a constitutional challenge to the definition of "household" in the Food Stamp Act, 7 U. S. C. § 2012(i), which treats parents, siblings, and children who live together, but not more distant relatives or unrelated per-

sons who do so, as a single household for purposes of defining eligibility for food stamps. Although the challenge in that case was brought solely on equal protection grounds, and not under the First Amendment, the Court was obliged to decide whether the statutory classification should be reviewed under a stricter standard than mere rational-basis review because it "'directly and substantially' interfere[s] with family living arrangements and thereby burden[s] a fundamental right." 477 U. S., at 638. The Court held that it did not, explaining that the definition of "household" does not "order or prevent any group of persons from dining together. Indeed, in the overwhelming majority of cases it probably has no effect at all. It is exceedingly unlikely that close relatives would choose to live apart simply to increase their allotment of food stamps, for the costs of separate housing would almost certainly exceed the incremental value of the additional stamps." *Ibid.*; see also *id.*, at 643 (BRENNAN, J., dissenting) (stating that rational-basis review is applicable); *ibid.* (WHITE, J., dissenting) (same).

The same rationale applies in this case. As was true of the provision at issue in *Castillo*, it is "exceedingly unlikely" that § 109 will "prevent any group of persons from dining together." *Id.*, at 638. Even if isolated instances can be found in which a striking individual may have left the other members of the household in order to increase their allotment of food stamps,[3] "in the overwhelming majority of cases [the statute] probably has no effect at all." *Ibid.* The statute certainly does not "order" any individuals not to dine to-

[3] The District Court did not find that any individuals had left their households in order to increase their allotment of food stamps. It found instead only that some individuals "have been told by state agencies *or* have learned that they can avoid household disqualification by having the striker leave the household." 648 F. Supp. 1234, 1237 (DC 1986). Appellees note that one striker's spouse and children left the household after he was denied food stamps, and that the couple was subsequently divorced. Affidavit of Mark Dyer, ¶¶ 4–8, App. 25–26; Deposition of Mark Dyer, *id.*, at 82–83.

gether; nor does it in any other way "'directly and substantially' interfere with family living arrangements." *Ibid.*

The statute also does not infringe the associational rights of appellee individuals and their unions. We have recognized that "one of the foundations of our society is the right of individuals to combine with other persons in pursuit of a common goal by lawful means," *NAACP* v. *Claiborne Hardware Co.*, 458 U. S. 886, 933 (1982), and our recognition of this right encompasses the combination of individual workers together in order better to assert their lawful rights. See, *e. g.*, *Railroad Trainmen* v. *Virginia*, 377 U. S. 1, 5–6 (1964). But in this case, the statute at issue does not "'directly and substantially' interfere" with appellees' ability to associate for this purpose. *Lyng, supra,* at 638.[4] It does not "order" appellees not to associate together for the purpose of conducting a strike, or for any other purpose, and it does not "prevent" them from associating together or burden their ability to do so in any significant manner. As we have just stated with respect to the effect of this statute on an individual's decision to remain in or to leave his or her household, it seems "exceedingly unlikely" that this statute will prevent individuals from continuing to associate together in unions to promote their lawful objectives. 477 U. S., at 638.

Prior cases indicate that § 109 has no unconstitutional impact on the right of individuals to associate for various purposes. *Lincoln Union* v. *Northwestern Iron & Metal Co.*, 335 U. S. 525, 530–531 (1949), for example, held that where a State forbids employers to restrict employment to members of a union, enforcement of that state policy does not abridge

---

[4] The District Court found that one individual quit his job and abandoned his union membership in order to receive food stamps, and another individual left a picket line to seek other work and lost his union membership. 648 F. Supp., at 1237. Some other strikers have voted to ratify or accept collective-bargaining agreements that were less favorable than they wished, motivated by lack of wages as a result of being out of work and, to a lesser degree, lack of food stamps. *Ibid.*

the associational rights of unions or their members, despite their claim that a closed shop "is 'indispensable to the right of self-organization and the association of workers into unions.'" Similarly, in *Board of Directors of Rotary Int'l* v. *Rotary Club*, 481 U. S. 537, 548 (1987), we held that requiring Rotary Clubs to admit women "does not require the clubs to abandon or alter" any of their activities or their basic goals and therefore did not abridge the members' associational rights. Both of those cases upheld state laws that exerted a much more direct and substantial threat to associational freedoms than the statute at issue here.[5]

---

[5] It is clear from previous decisions that associational rights "are protected not only against heavy-handed frontal attack, but also from being stifled by more subtle governmental interference," *Bates* v. *Little Rock*, 361 U. S. 516, 523 (1960), and that these rights can be abridged even by government actions that do not directly restrict individuals' ability to associate freely. See, *e. g.*, *Healy* v. *James*, 408 U. S. 169, 183 (1972). But none of these cases indicates that the statute challenged here "will affect in any significant way the existing members' ability to carry out their various purposes." *Board of Directors of Rotary Int'l* v. *Rotary Club*, 481 U. S., at 548. The Court has found, for example, that compulsory disclosure of the membership lists of an organization, which led to harassment, physical threats, and economic reprisals against those individuals, worked "a substantial restraint upon the exercise by petitioner's members of their right to freedom of association." *NAACP* v. *Alabama ex rel. Patterson*, 357 U. S. 449, 462 (1958). We also have held that the First Amendment "restricts the ability of the State to impose liability on an individual solely because of his association with another" when the individual lacks the specific intent to further any illegal aims that may be promoted by other members of a group. *NAACP* v. *Claiborne Hardware Co.*, 458 U. S. 886, 919–920 (1982). The facts of this case, however, do not demonstrate any "significant" interference with appellees' associational rights of the magnitude found in decisions like *Patterson* and *Claiborne Hardware*. Exposing the members of an association to physical and economic reprisals or to civil liability merely because of their membership in that group poses a much greater danger to the exercise of associational freedoms than does the withdrawal of a government benefit based not on membership in an organization but merely for the duration of one activity that may be undertaken by that organization.

Any impact on associational rights in this case results from the Government's refusal to extend food stamp benefits to those on strike, who are now without their wage income. Denying such benefits makes it harder for strikers to maintain themselves and their families during the strike and exerts pressure on them to abandon their union. Strikers and their union would be much better off if food stamps were available, but the strikers' right of association does not require the Government to furnish funds to maximize the exercise of that right. "We have held in several contexts [including the First Amendment] that a legislature's decision not to subsidize the exercise of a fundamental right does not infringe the right." *Regan* v. *Taxation with Representation of Washington*, 461 U. S. 540, 549 (1983). Exercising the right to strike inevitably risks economic hardship, but we are not inclined to hold that the right of association requires the Government to minimize that result by qualifying the striker for food stamps.

In *Ohio Bureau of Employment Services* v. *Hodory*, 431 U. S. 471 (1977), we upheld a statute that denied unemployment compensation benefits to workers who are thrown out of work as a result of a labor dispute other than a lockout, saying that the case "does not involve any discernible fundamental interest." *Id.*, at 489.[6] Although the complaining worker there was a nonstriking employee of a parent company that found it necessary to close because its subsidiary was on strike, it is clear enough that the same result would have obtained had the striking employees themselves applied for compensation.

---

[6] The decision in *Hodory* was based on the Equal Protection Clause of the Fourteenth Amendment and not on the First Amendment, but our application of rational-basis review to the constitutional claim raised in that case indicated that fundamental rights guaranteed by the First Amendment were not implicated there.

## B

For the same reasons, we cannot agree that § 109 abridges appellees' right to express themselves about union matters free of coercion by the Government. Appellees rely on *Abood* v. *Detroit Board of Education,* 431 U. S. 209 (1977). But we do not read either *Abood* or the First Amendment as providing support for this claim. In *Abood,* the challenged state law required certain employees to pay a fee to their representative union. We ruled that this law violated the First Amendment insofar as it allowed those funds to be used to promote political and ideological purposes with which the employees disagreed and to which they objected, because by its terms the employees were "compelled to make . . . contributions for political purposes." *Id.,* at 234. We based this conclusion on our observation that "at the heart of the First Amendment is the notion that an individual should be free to believe as he will, and that in a free society one's beliefs should be shaped by his mind and his conscience rather than coerced by the State." *Id.,* at 234–235. By contrast, the statute challenged in this case requires no exaction from any individual; it does not "coerce" belief; and it does not require appellees to participate in political activities or support political views with which they disagree. It merely declines to extend additional food stamp assistance to striking individuals simply because the decision to strike inevitably leads to a decline in their income. And this Court has explicitly stated that even where the Constitution prohibits coercive governmental interference with specific individual rights, it "'does not confer an entitlement to such funds as may be necessary to realize all the advantages of that freedom.'" *Regan, supra,* at 550, quoting *Harris* v. *McRae,* 448 U. S. 297, 318 (1980).[7]

---

[7] Appellees rely heavily on *Sherbert* v. *Verner,* 374 U. S. 398 (1963), in which we held that a State violated the Free Exercise Clause of the First Amendment when it denied unemployment benefits to a woman whose religious beliefs did not allow her to work on Saturday. That decision, how-

## III

Because the statute challenged here has no substantial impact on any fundamental interest and does not "affect with particularity any protected class," *Hodory, supra,* at 489,[8] we confine our consideration to whether the statutory classification "is rationally related to a legitimate governmental interest." *Department of Agriculture* v. *Moreno,* 413 U. S. 528, 533 (1973). We have stressed that this standard of review is typically quite deferential; legislative classifications are "presumed to be valid," *Massachusetts Board of Retirement* v. *Murgia,* 427 U. S. 307, 314 (1976), largely for the reason that "the drawing of lines that create distinctions is peculiarly a legislative task and an unavoidable one." *Ibid.;* see *Dandridge* v. *Williams,* 397 U. S. 471, 485 (1970).

Appellant submits that this statute serves three objectives. Most obvious, given its source in OBRA, is to cut federal expenditures. Second, the limited funds available

---

ever, "was decided in the significantly different context of a constitutionally imposed 'governmental obligation of neutrality' originating in the Establishment and Freedom of Religion Clauses of the First Amendment." *Maher* v. *Roe,* 432 U. S. 464, 475, n. 8 (1977). The reasoning of *Sherbert* has not been applied in other contexts, and is inapposite here as shown by our decision in *Hodory,* which found no fundamental rights to be infringed by a State's denial of unemployment benefits to a man who was unable to work as a result of a labor dispute.

[8] We reject the proposition that strikers as a class are entitled to special treatment under the Equal Protection Clause. *City of Charlotte* v. *Firefighters,* 426 U. S. 283, 286 (1976); *Hodory,* 431 U. S., at 489. *Department of Agriculture* v. *Moreno,* 413 U. S. 528 (1973), does not counsel otherwise. There we upheld an equal protection challenge to a provision of the Food Stamp Act and concluded that "a bare congressional desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest." *Id.,* at 534 (emphasis in original). This statement is merely an application of the usual rational-basis test: if a statute is not rationally related to any legitimate governmental objective, it cannot be saved from constitutional challenge by a defense that relates it to an *illegitimate* governmental interest. Accordingly, in *Moreno* itself we examined the challenged provision under the rational-basis standard of review. *Id.,* at 533.

were to be used when the need was likely to be greatest, an approach which Congress thought did not justify food stamps for strikers. Third was the concern that the food stamp program was being used to provide one-sided support for labor strikes; the Senate Report indicated that the amendment was intended to remove the basis for that perception and criticism. S. Rep., at 62.

We have little trouble in concluding that § 109 is rationally related to the legitimate governmental objective of avoiding undue favoritism to one side or the other in private labor disputes. The Senate Report declared: "Public policy demands an end to the food stamp subsidization of all strikers who become eligible for the program solely through the temporary loss of income during a strike. Union strike funds should be responsible for providing support and benefits to strikers during labor-management disputes." *Ibid.* It was no part of the purposes of the Food Stamp Act to establish a program that would serve as a weapon in labor disputes; the Act was passed to alleviate hunger and malnutrition and to strengthen the agricultural economy. 7 U. S. C. § 2011. The Senate Report stated that "allowing strikers to be eligible for food stamps has damaged the program's public integrity" and thus endangers these other goals served by the program. S. Rep., at 62. Congress acted in response to these problems.

It would be difficult to deny that this statute works at least some discrimination against strikers and their households. For the duration of the strike, those households cannot increase their allotment of food stamps even though the loss of income occasioned by the strike may well be enough to qualify them for food stamps or to increase their allotment if the fact of the strike itself were ignored. Yet Congress was in a difficult position when it sought to address the problems it had identified. Because a striking individual faces an immediate and often total drop in income during a strike, a single controversy pitting an employer against its employees can

lead to a large number of claims for food stamps for as long as the controversy endures. It is the disbursement of food stamps in response to such a controversy that constitutes the source of the concern, and of the dangers to the program, that Congress believed it was important to remedy. We are not free in this instance to reject Congress' views about "what constitutes wise economic or social policy." *Dandridge, supra*, at 486.

It is true that in terms of the scope and extent of their ineligibility for food stamps, § 109 is harder on strikers than on "voluntary quitters."[9] See 648 F. Supp., at 1253–1254 (Appendix A); compare 7 CFR § 273.1(g) (1987) with *id.*, § 273.7(n). But the concern about neutrality in labor disputes does not arise with respect to those who, for one reason or another, simply quit their jobs. As we have stated in a related context, even if the statute "provides only 'rough justice,' its treatment . . . is far from irrational." *Hodory*, 431 U. S., at 491. Congress need not draw a statutory classification to the satisfaction of the most sharp-eyed observers in order to meet the limitations that the Constitution imposes in this setting. And we are not authorized to ignore Congress' considered efforts to avoid favoritism in labor disputes, which are evidenced also by the two significant provisos contained in the statute. The first proviso preserves eligibility for the program of any household that was eligible to receive stamps "immediately prior to such strike." 7 U. S. C. § 2015(d)(3). The second proviso makes clear that the statutory ineligibility for food stamps does not apply "to any household that does not contain a member on strike, if any of its members refuses to accept employment at a plant or site because of a strike or lockout." *Ibid.* In light of all this, the statute is

---

[9] For example, one who voluntarily quits a job is disqualified for food stamps for 90 days. Thereafter, he is eligible as long as he registers for work and cannot find a job. 7 CFR § 273.7(n)(1)(v) (1987). The striker, unless he quits his job, is disqualified for as long as he is on strike. § 273.1(g).

rationally related to the stated objective of maintaining neutrality in private labor disputes.

In view of the foregoing, we need not determine whether either of the other two proffered justifications for § 109 would alone suffice. But it is relevant to note that protecting the fiscal integrity of Government programs, and of the Government as a whole, "is a legitimate concern of the State." *Hodory, supra,* at 493. This does not mean that Congress can pursue the objective of saving money by discriminating against individuals or groups. But our review of distinctions that Congress draws in order to make allocations from a finite pool of resources must be deferential, for the discretion about how best to spend money to improve the general welfare is lodged in Congress rather than the courts. *Bowen* v. *Owens,* 476 U. S. 340, 345 (1986). "Fiscal considerations may compel certain difficult choices in order to improve the protection afforded to the entire benefited class." *Harris* v. *McRae,* 448 U. S., at 355 (STEVENS, J., dissenting). In OBRA Congress had already found it necessary to restrict eligibility in the food stamp program and to reduce the amount of deductions that were allowed to recipients. Rather than undertaking further budget cuts in these or other areas, and in order to avoid favoritism in labor disputes, Congress judged that it would do better to pass this statute along with its provisos. The Constitution does not permit us to disturb that judgment in this case.

Appellees contend and the District Court held that the legislative classification is irrational because of the "critical" fact that it "impermissibly strikes at the striker through his family." 648 F. Supp., at 1240. This, however, is nothing more than a description of how the food stamp program operates as a general matter, a fact that was acknowledged by the District Court. *Ibid.* Whenever an individual takes any action that hampers his or her ability to meet the program's eligibility requirements, such as quitting a job or failing to comply with the work-registration requirements, the entire house-

hold suffers accordingly. We have never questioned the constitutionality of the entire Act on this basis, and we just recently upheld the validity of the Act's definition of "household" even though that definition embodies the basic fact that the Act determines benefits "on a 'household' rather than an individual basis." *Lyng*, 477 U. S., at 636. That aspect of the program does not violate the Constitution any more so today.

The decision of the District Court is therefore

*Reversed.*

JUSTICE KENNEDY took no part in the consideration or decision of this case.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN and JUSTICE BLACKMUN join, dissenting.

The Court today declares that it has "little trouble" in concluding that Congress' denial of food stamps to the households of striking workers is rationally related to a legitimate governmental objective. *Ante*, at 371. The ease with which the Court reaches this conclusion is reflected in the brevity of its Fifth Amendment analysis: the Court gives short shrift to appellees' equal protection challenge to the striker amendment even though this argument was the centerpiece of appellees' case in their briefs and at oral argument. I believe that the Court's dismissive approach has caused it to fail to register the full force of appellees' claim. After canvassing the many absurdities that afflict the striker amendment, I conclude that it fails to pass constitutional muster under even the most deferential scrutiny. I therefore would affirm the judgment below.

I

The thrust of appellees' equal protection challenge is that the striker amendment to the Food Stamp Act — § 109 of the Omnibus Budget Reconciliation Act of 1981, codified at 7 U. S. C. § 2015(d)(3) — singles them out for special punitive

treatment without reasonable justification. As the Court observes, this Fifth Amendment challenge to an allegedly arbitrary legislative classification implicates our least intrusive standard of review—the so-called "rational basis" test, which requires that legislative classifications be " 'rationally related to a legitimate governmental interest.' " [1] *Ante,* at 370, quoting *Department of Agriculture* v. *Moreno,* 413 U. S. 528, 533 (1973). The Court fails to note, however, that this standard of review, although deferential, " 'is not a toothless one.' " *Mathews* v. *De Castro,* 429 U. S. 181, 185 (1976), quoting *Mathews* v. *Lucas,* 427 U. S. 495, 510 (1976). The rational-basis test contains two substantive limitations on legislative choice: legislative enactments must implicate legitimate goals, and the means chosen by the legislature must bear a rational relationship to those goals. In an alternative formulation, the Court has explained that these limitations amount to a prescription that "all persons similarly situated should be treated alike." *Cleburne* v. *Cleburne Living Center, Inc.,* 473 U. S. 432, 439 (1985); see *Plyler* v. *Doe,* 457 U. S. 202, 216 (1982); *Reed* v. *Reed,* 404 U. S. 71, 76 (1971).

In recent years, the Court has struck down a variety of legislative enactments using the rational-basis test. In some cases, the Court found that the legislature's goal was not legitimate. See, *e. g., Hooper* v. *Bernalillo County Assessor,* 472 U. S. 612 (1985); *Zobel* v. *Williams,* 457 U. S. 55 (1982). In other cases, the Court found that the classification employed by the legislature did not rationally further the legislature's goal. See, *e. g., Lindsey* v. *Normet,* 405 U. S. 56 (1972); *Reed* v. *Reed, supra,* at 76–77. In addition, the Court on occasion has combined these two approaches, in essence concluding that the lack of a rational relationship be-

---

[1] Because I conclude that the striker amendment fails the deferential rational-basis test, I see no need to address whether stricter scrutiny should apply to protect the First Amendment interests asserted by appellees, although I am unconvinced by the Court's treatment of that issue as well.

tween the legislative classification and the purported legislative goal suggests that the true goal is illegitimate. See, e. g., *Cleburne* v. *Cleburne Living Center, Inc., supra,* at 450; *Department of Agriculture* v. *Moreno, supra,* at 534. The Court's failure today to take seriously appellees' challenge or to address systematically the irrationalities they identify in the striker amendment is difficult to reconcile with these precedents.

The Secretary asserts that the striker amendment is rationally related to three legitimate governmental goals. First, the Secretary points out that denying food stamps to households containing a striker will reduce federal expenditures. Second, the Secretary contends that the striker amendment channels limited public funds to the most needy. Finally, the Secretary maintains that the striker amendment fosters governmental neutrality in private labor disputes. Although the asserted goals are legitimate, it is difficult to discern a rational relationship between them and the striker amendment. The arguments of the Secretary and the Court seeking to establish such a relationship are fraught with pervasive inconsistencies.

### A

The Secretary's argument that the striker amendment will save money proves far too much. According to the Secretary's reasoning, the exclusion of any unpopular group from a public benefit program would survive rational-basis scrutiny, because exclusion always would result in a decrease in governmental expenditures. Although it is true, as the Court observes, that preserving the fiscal integrity of the Government "'is a legitimate concern of the State,'" *ante,* at 373, quoting *Ohio Bureau of Employment Services* v. *Hodory,* 431 U. S. 471, 493 (1977), this Court expressly has noted that "a concern for the preservation of resources standing alone can hardly justify the classification used in allocating those resources." *Plyler* v. *Doe, supra,* at 227. We have insisted that such classifications *themselves* be rational rather than

arbitrary. See *Reed* v. *Reed, supra,* at 76; *Shapiro* v. *Thompson,* 394 U. S. 618, 633 (1968). Our cases thus make clear that something more than an invocation of the public fisc is necessary to demonstrate the rationality of selecting strikers, rather than some other group, to suffer the burden of cost-cutting legislation.[2]

### B

Perhaps recognizing this necessity, the Secretary defends the singling out of strikers and their households as rationally related to the goal of channeling resources to those persons most "'genuinely in need.'" Brief for Appellant 17, quoting 119 Cong. Rec. 24929 (1973) (remarks of Rep. Young). As a threshold matter, however, households denied food stamps because of the presence of a striker are as "needy" in terms of financial resources as households that qualify for food stamps: the former are denied food stamps *despite* the fact that they meet the financial eligibility requirements of 7 U. S. C. § 2014 (1982 ed. and Supp. IV), even after strike-fund payments are counted as household income. This point has particular poignancy for the infants and children of a striking worker. Their need for nourishment is in no logical way diminished by the striker's action. The denial to these chil-

---

[2] In addition, there is substantial reason to question the invocation of the public fisc in this case. Statistics available to Congress at the time of the enactment of the striker amendment indicated that strikers rarely met the financial eligibility requirements of the food stamp program and thus rarely participated in the program. A Government Accounting Office study found that in four out of five periods studied, 89 to 96 percent of strikers did not participate in the food stamp program. In the fifth period, which included the 1978 coal strike, 64 percent of strikers did not participate. 127 Cong. Rec. 12157 (1981) (remarks of Sen. Levin). The strikers who do participate in the food stamp program apparently account for only a very small percentage of total program outlays. Statistical information collected by the House Committee on Agriculture in 1975 indicated that households containing strikers accounted for only 0.2 to 0.3 percent of non-public-assistance households participating in the food stamp program. H. R. Rep. No. 95–464, p. 128 (1977).

dren of what is often the only buffer between them and malnourishment and disease cannot be justified as a targeting of the most needy: they *are* the most needy.  The record below bears witness to this point in a heartbreaking fashion.[3]

The Secretary argues, however, that the striker amendment is related to need at least in the sense of willingness to work, if not in the strict sense of financial eligibility. Because the Food Stamp Act generally excludes persons unwilling to work—and their households—the Secretary argues that it is consistent to exclude strikers and their households as well, on the ground that strikers remain "unwilling to work," at least at the struck business, for the duration of the strike.  In the Secretary's eyes, a striker is akin to an unemployed worker who day after day refuses to accept available work.  One flaw in this argument is its false factual premise. It is simply not true, as the Secretary argues, that a striker always has a job that "remains available to him."  Reply Memorandum for Appellant 4.  Many strikes result in the complete cessation of a business' operations, so that the decision of an individual striker to return to work would be unavailing.  Moreover, many of the businesses that continue to operate during a strike hire permanent replacements for the striking workers.  In this situation as well, a striker no longer has the option of returning to work.  In fact, the record in this case reveals that a number of appellees were

[3] See Declaration of Donald A. Bivens, App. 8 ("My two younger children were sick a great deal during the period of the strike and I believe it was, in part, due to a lack of nourishment"); Declaration of Johnie B. Blake, *id.*, at 11 (finding it "nearly impossible to get adequate food for [household of] seven people" during strike); Affidavit of Barm Combs, *id.*, at 20 ("My daughter Jennifer Ann, who has serious kidney problems, was missing needed medical treatment and medication"); Declaration of Robert J. Shorb, Jr., *id.*, at 47 ("[O]ur children were in danger of not having enough to eat.  Therefore, we had to send them to live with their grandparents in New York State so that they would get enough nourishment").

denied food stamps even though they had been permanently replaced by their employers.[4]

But even if it were true that strikers always can return to their jobs, the Secretary's "willingness to work" rationale falls apart in light of the glaring disparity between the treatment of strikers and the treatment of those who are unwilling to work for other reasons. People who voluntarily quit their jobs are not disqualified from receiving food stamps if, after notice and a hearing, they can demonstrate that they quit with "good cause." 7 CFR §§ 273.7(n)(1)(i), (vi) (1987).[5] Moreover, even if the state agency determines that the quit was without good cause, the voluntary quitter is disqualified only for a period of 90 days, and the quitter's household is disqualified only if the quitter was the "head of household." § 273.7(n)(1)(v). In contrast, a striker is given no opportunity to demonstrate that the strike was for "good cause," even though strikers frequently allege that unfair labor practices by their employer precipitated the strike.[6] In addition, strikers and their entire households, no matter how minimal the striker's contribution to the household's income may have been, are disqualified for the duration of the strike, even if the striker is permanently replaced or business operations temporarily cease.

---

[4] See Declaration of Ray Westfall, *id.*, at 51; Supplemental Declaration of Johnie B. Blake, *id.*, at 14–15; Affidavit of Donald Gibson, *id.*, at 34; Affidavit of Zola Higgins, *id.*, at 37.

[5] "Good cause" as defined in the applicable regulations includes, *inter alia*, "[d]iscrimination by an employer based on age, race, sex, color, handicap, religious beliefs, national origin or political beliefs," 7 CFR § 273.7(n)(3)(i) (1987), "[w]ork demands or conditions that render continued employment unreasonable, such as working without being paid on schedule," § 273.7(n)(3)(ii), or work conditions under which "[t]he degree of risk to health and safety is unreasonable," § 273.7(i)(2)(i), incorporated by reference in § 273.7(n)(3)(vi).

[6] See, *e. g.*, Affidavit of Zola Higgins, App. 36–37; Affidavit of Paul David Michel, *id.*, at 39–40; Declaration of Ray Westfall, *id.*, at 51–52.

In a similar vein, the striker amendment expressly distinguishes between strikers and nonstrikers in conditioning eligibility for food stamps on willingness to accept struck work. Unemployed workers may refuse to accept otherwise appropriate employment at a business involved in a strike or a lockout and still remain eligible to receive food stamps — as long as they are not themselves on strike. Only strikers, though they may be as "willing to work" in every salient respect, must give up their eligibility for food stamps if they refuse to cross a picket line.[7] The Secretary's "willingness to work" argument provides no justification for this especially harsh treatment of strikers and their households.

## C

Unable to explain completely the striker amendment by the "willingness to work" rationale, the Secretary relies most heavily on yet a third rationale: the promotion of governmental neutrality in labor disputes. Indeed, the Court relies solely on this explanation in rejecting appellees' equal protection challenge to the amendment. According to the Secretary and the Court, this last goal rationalizes the discrepancies in the treatment of strikers and voluntary quitters, and of strikers and nonstrikers unwilling to cross a picket line. As the Court explains it, excluding strikers from participation in the food stamp program avoids "undue favoritism to one side or the other in private labor disputes" by preventing

---

[7] In addition, strikers may not become eligible for food stamps even if they demonstrate their "willingness to work" by registering for and accepting alternative interim employment. Indeed, the fact that strikers had been subject to the same work registration and acceptance requirements as all other food stamp applicants prior to the enactment of the striker amendment casts considerable doubt on the Secretary's argument that the amendment's purpose was to ensure that food stamp recipients are "willing to work." Cf. *Department of Agriculture* v. *Moreno*, 413 U. S. 528, 537 (1973) (existence of fraud provisions prior to the amendment denying food stamps to households containing unrelated persons "necessarily casts considerable doubt upon the proposition that the 1971 amendment could rationally have been intended to prevent those very same abuses").

governmental "'subsidization'" of strikes. *Ante,* at 371, quoting S. Rep. No. 97–139, p. 62 (1981). The Court notes that we accepted a version of this governmental neutrality argument "in a related context" in *Ohio Bureau of Employment Services* v. *Hodory,* 431 U. S. 471 (1977). See *ante,* at 372.

As a threshold matter, the Court's reliance on *Hodory* to support the Secretary's argument is misplaced. In *Hodory,* we upheld a statute that denied unemployment compensation benefits to workers who became unemployed as a result of a labor dispute other than a lockout. The Court reasoned that the denial was rationally related to the goal of maintaining governmental neutrality in labor disputes because the unemployment compensation at issue was partially funded by employer contributions. We recognized that "[t]he employer's costs go up with every laid-off worker who is qualified to collect unemployment. The only way for the employer to stop these rising costs is to settle the strike so as to return the employees to work. Qualification for unemployment compensation thus acts as a lever increasing the pressures on an employer to settle a strike." 431 U. S., at 492. The reasoning of *Hodory* is completely inapplicable to the food stamp context. Employer contributions form no part of food stamp benefits, which are funded instead by general public revenues; receipt of food stamps by strikers therefore places no special or coercive burden on the strikers' employer.

More important, the "neutrality" argument on its merits is both deceptive and deeply flawed. Even on the most superficial level, the striker amendment does not treat the parties to a labor dispute evenhandedly: forepersons and other management employees who may become temporarily unemployed when a business ceases to operate during a strike remain eligible for food stamps. Management's burden during the course of the dispute is thus lessened by the receipt of public funds, whereas labor must struggle unaided. This disparity cannot be justified by the argument that the strike is labor's "fault," because strikes are often a direct response

to illegal practices by management, such as failure to abide by the terms of a collective-bargaining agreement or refusal to bargain in good faith.

On a deeper level, the "neutrality" argument reflects a profoundly inaccurate view of the relationship of the modern Federal Government to the various parties to a labor dispute. Both individuals and businesses are connected to the Government by a complex web of supports and incentives. On the one hand, individuals may be eligible to receive a wide variety of health, education, and welfare-related benefits. On the other hand, businesses may be eligible to receive a myriad of tax subsidies through deductions, depreciation, and credits, or direct subsidies in the form of Government loans through the Small Business Administration (SBA). Businesses also may receive lucrative Government contracts and invoke the protections of the Bankruptcy Act against their creditors. None of these governmental subsidies to businesses is made contingent on the businesses' abstention from labor disputes, even if a labor dispute is the direct cause of the claim to a subsidy. For example, a small business in need of financial support because of labor troubles may seek a loan from the SBA. See 15 U. S. C. § 661 *et seq.* And a business that claims a net operating loss as a result of a strike or a lockout presumably may carry the loss back three years and forward five years in order to maximize its tax advantage. See 26 U. S. C. §§ 172, 381, 382. In addition, it appears that businesses may be eligible for special tax credits for hiring replacement workers during a strike under the Targeted Jobs Tax Credit program. See BNA Daily Labor Report No. 68, p. A–6 (April 10, 1987). When viewed against the network of governmental support of both labor and management, the withdrawal of the single support of food stamps—a support critical to the continued life and health of an individual worker and his or her family—cannot be seen as a "neutral" act. Altering the backdrop of gov-

ernmental support in this one-sided and devastating way amounts to a penalty on strikers, not neutrality.

## D

In *Cleburne* v. *Cleburne Living Center, Inc.*, 473 U. S. 432 (1985), we concluded that the insubstantiality of each of the city's asserted justifications for the ordinance at issue suggested that the ordinance in fact rested "on an irrational prejudice against the mentally retarded." *Id.*, at 450. The successive failure of each of the Secretary's purported rationales for the striker amendment likewise suggests that the enactment at issue here rests on public animus toward strikers. This conclusion draws substantial support from the legislative history of the precursors of the 1981 amendment. Beginning in 1968, four years after the enactment of the Food Stamp Act, Congress considered at regular intervals proposals similar or identical to the striker amendment eventually passed in 1981. Such proposals were considered and rejected in 1968, 1970, 1971, 1972, 1973, 1974, and 1977. Each time a proposal was discussed on the floor of the House, Representatives decried the "antiunion" and "antistrike" animus that motivated it.[8] In 1977, the House

---

[8] See, *e. g.*, 116 Cong. Rec. 42019 (1970) (decrying "the apparent antistrike aspect" of the proposed amendment) (remarks of Rep. Conyers); 117 Cong. Rec. 21675 (1971) ("This amendment cannot be justified by any public good that could come of it; none can. It is at its base mean-spirited, vindictive and vengeful") (remarks of Rep. Foley); 118 Cong. Rec. 23376 (1972) ("Those seeking to pass this amendment are simply opposed to strikes . . . and hope to assist the employer in breaking a strike with this cruel amendment") (remarks of Rep. Koch); 119 Cong. Rec. 24931 (1973) ("This amendment is punitive, antilabor, antiunion, unfair, and discriminatory") (remarks of Rep. Foley); *id.*, at 24934 ("I think it would be unconstitutional . . . for us to say that we can cut out a segment of our society just because they are doing something that some other segment of our society does not like") (remarks of Rep. Casey); 120 Cong. Rec. 20614 (1974) (noting that voluntary quitters, convicted felons, and alcoholics may receive food stamps and that the striker amendment "only draws the line against one small group of people") (remarks of Rep. O'Hara).

Committee on Agriculture reviewed the history of such pro-
posals and rejected the most recent one, explaining its deci-
sion as follows:

> "The real purpose of the amendment . . . was not to
> restore some government neutrality allegedly lost be-
> cause strikers are eligible for food stamps but, on the
> contrary, to use a denial of food stamps as a pressure on
> the worker—or more accurately on his family—to help
> break a strike. . . . .
>
> "The amendment was an effort to increase the power
> of management over workers, using food as a weapon in
> collective bargaining." H. R. Rep. No. 95–464, p. 129
> (1977).

I am mindful that the views expressed on the floor of the
House and in the 1977 Committee Report were from those
opposed to the striker amendment. But the evidence of ani-
mus is not limited to statements by the amendment's oppo-
nents. Rather, supporters of the striker amendment likened
strikers to "hippies" and "commune residents"—groups
whose exclusion from the food stamp program this Court
struck down 15 years ago in *Department of Agriculture* v.
*Moreno*, 413 U. S. 528 (1973).[9] The exhortation by the
sponsor of the 1971 version of the striker amendment to his
colleagues to "say to strikers what we have said . . . to hip-
pies," 117 Cong. Rec. 21673 (1971) (remarks of Rep. Michel),
strongly suggests that the same sort of hostility informed the
two amendments, although the striker amendment was not

---

[9] See 117 Cong. Rec. 21673 (1971) (We should "say to strikers what we
have said to students, to hippies, and others— '. . . if you are one of the
voluntarily poor, you must look to your own resources for help' ") (remarks
of Rep. Michel); 119 Cong. Rec. 24931 (1973) ("[I]n the early history of
the program, food stamps for strikers, college students, hippies, and com-
mune residents never entered into the minds of food stamp proponents")
(remarks of Rep. Goodling).

enacted into law until 1981.[10]  Our warning in *Moreno* that "a bare congressional desire to harm a politically unpopular group cannot constitute a *legitimate* governmental interest," 413 U. S., at 534, would seem directly applicable to the instant case.  I find the Court's refusal to heed that warning both inexplicable and ill considered.

## II

I agree with the Court that "[i]t was no part of the purposes of the Food Stamp Act to establish a program that would serve as a weapon in labor disputes." *Ante*, at 371. The striker amendment under consideration today, however, seems to have precisely that purpose—one admittedly irreconcilable with the legitimate goals of the food stamp program.  No other purpose can adequately explain the especially harsh treatment reserved for strikers and their families by the 1981 enactment.  Because I conclude that the striker amendment cannot survive even rational-basis scrutiny, I would affirm the District Court's invalidation of the amendment.  I dissent.

---

[10] The remarks of Representatives over the years admittedly express the views of different Congresses from the one that eventually passed the 1981 striker amendment.  Nonetheless, the length of time over which the same proposal was considered and the frequent references over the years by Representatives to former colloquies on the matter, see, *e. g.*, 117 Cong. Rec. 21672 (1971) (remarks of Rep. Michel) (referring to 1970 debate); 119 Cong. Rec. 24933 (1973) (remarks of Rep. Casey) (referring to 1971 debate); H. R. Rep. No. 95–464, pp. 122–127 (1977) (canvassing the amendment's legislative history from 1968 to 1977), strongly suggest that these earlier discussions informed the 1981 decision.