Bonnie **KRAHAM**, Plaintiff–Appellant,

v.

Jonathan **LIPPMAN**, sued in his individual and official capacity as Chief Administrative Judge of the State of New York, and the Office of Court Administration, Defendants–Appellees.

Docket No. 06–2695–CV.

United States Court of Appeals,
Second Circuit.

Argued: Jan. 25, 2007.

Decided: Feb. 27, 2007.

Stephen Bergstein, Bergstein & Ullrich, LLP, Chester, NY, for plaintiff-appellant.

Shawn Kerby, Assistant Deputy Counsel (Michael Colodner, John Eiseman, on the brief), Office of Court Administration, New York, NY, for defendant-appellee.

Laura R. Johnson, Assistant Solicitor General (for Eliot Spitzer, Attorney General of the State of New York; Robert Easton, Deputy Solicitor General, on the

brief), for Amicus Curiae State of New York.

Before SOTOMAYOR and HALL, Circuit Judges, and KOELTL, District Judge.*

SOTOMAYOR, Circuit Judge.

Plaintiff-appellant Bonnie Kraham appeals from the May 19, 2006 judgment of the United States District Court for the Southern District of New York (Robinson, J.), *Kraham v. Lippman*, No. 04 Civ. 1684 (S.D.N.Y. May 17, 2006), granting summary judgment to defendants-appellees Jonathan Lippman, sued in his individual and official capacities as Chief Administrative Judge of the State of New York, and the Office of Court Administration (collectively, "defendants"). Kraham alleges that section 36.2(c)(4)(i) of the Rules of the Chief Judge of the State of New York ("the Rule"), which prohibits certain high-ranking political party officials, their families, and the members, associates, counsel, and employees of their law firms from receiving New York State court fiduciary appointments, violates her First Amendment right to political association. We find that the Rule withstands rational basis scrutiny and affirm the judgment of the district court.

## BACKGROUND

The following history of the Rule's genesis is drawn from the reports of the Office of the Inspector General for Fiduciary Appointments and the Commission on Fiduciary Appointments, *see* Office of the Inspector General for *Fiduciary Appointments, Fiduciary Appointments in New York: A Report to Chief Judge Judith S. Kaye and Chief Administrative Judge Jonathan Lippman* (Dec. 3, 2001) ("Special Inspector General Report"); Report of the Commission on Fiduciary Appointments (Dec.2001) ("Commission Report"), as well as the affidavit of defendant Jonathan Lippman, Chief Administrative Judge of the State of New York. Kraham has not disputed the factual accuracy of any of these materials.

New York courts appoint fiduciaries to assist courts and litigants in a number of capacities, including as guardians for incapacitated persons, receivers for properties involved in foreclosure proceedings, and guardians ad litem for children involved in litigation. In general, fiduciary appointees are private attorneys who are compensated from the assets of the individuals or businesses they have been assigned to represent or manage, and many fiduciary positions are highly remunerative. Because judges historically have had unregulated discretion to make these appointments, the process has been susceptible to abuse—for example, by judges' choosing appointees based on political connections—and has long been a subject of public attention and controversy. Beginning in 1967, New York undertook a number of reforms in the hopes of eliminating corruption in the process, but none successfully alleviated the problem.[1] In January 2000, public concerns about political influence in court fiduciary appointments reached a peak, af-

---

* The Honorable John G. Koeltl, United States District Judge for the Southern District of New York, sitting by designation.

1. In the 1960s and 1970s, the New York legislature instituted, and subsequently amended, a court appointee filing requirement, and the Appellate Division, First Department imposed a prohibition against judges' selecting fiduciaries in cases over which they presided. In 1980, a committee appointed by the First Department issued a report recommending reforms, which were never adopted. Finally, in 1986, then-Chief Judge Lawrence H. Cooke promulgated a comprehensive set of regulations governing fiduciary appointments, codified in part 36 of the Rules of the Chief Judge. Despite the limitations in these rules, however, abuse of the process persisted. *See* Lippman Aff. ¶¶ 5–11.

ter the press published a letter written by two disgruntled attorneys seeking to perpetuate their receipt of Brooklyn Supreme Court appointments as a political reward for service to their party.

In response to the explosion of public concern generated by the letter's disclosure, and the resulting impairment of public confidence in the judicial system, Chief Judge Judith S. Kaye announced a comprehensive program to reform the appointment process. To further this purpose, she established a Commission on Fiduciary Appointments (the "Commission") and an Office of the Special Inspector General for Fiduciary Matters (the "Special Inspector General"), and charged them with gathering data on appointments and making recommendations for improved practices. After conducting far-reaching investigations, these bodies released to the Chief Judge detailed reports documenting widespread problems in the appointment process, including appointments based on political party connections. *See* Special Inspector General Report at 19, 36–42; Commission Report at 25–26, 39. For example, the Special Inspector General found that one county political leader had received nearly one hundred appointments, another had received over seventy-five appointments, and an attorney whose small law firm employs another county leader had received nearly one hundred appointments. *See* Commission Report at 25–26 (describing information gathered by Special Inspector General). In light of these findings, the Commission recommended that political party leaders, their immediate relatives,

and the partners, legal associates, and other employees of their law firms be prohibited from receiving judicial appointments while the leaders served and for two years after resigning their positions. *Id.* at 39–40.

In consultation with the Administrative Board of the Courts and with the approval of the New York Court of Appeals, Chief Judge Kaye responded to these recommendations by adopting a new part 36 of the Rules of the Chief Judge.[2] This rule contained the following provision:

> No person who is the chair or executive director, or their equivalent, of a State or county political party, or the spouse, sibling, parent or child of that official, shall be appointed while that official serves in that position and for a period of two years after that official no longer holds that position. This prohibition shall apply to the members, associates, counsel and employees of any law firms or entities while the official is associated with that firm or entity.

N.Y. Comp.Codes R. & Regs. tit. 22, § 36.2(c)(4)(I) (2006). The Rule was to become effective June 30, 2003, but contained a "grandfather clause" allowing incumbent party chairs to avoid future restrictions on appointments by resigning their positions before January 1, 2003.

Kraham, a lawyer licensed to practice in the State of New York, was elected in September 2002 to serve as co-chair of the Orange County Democratic Committee. She remained in her position after the adoption of the Rule, and, around the time

**2.** The New York State Constitution empowers the Chief Judge of the Court of Appeals, as New York's chief judicial officer, to "establish standards and administrative policies for general application throughout the state." N.Y. Const., art. VI, § 28(c). Section 211 of the New York Judiciary Law directs the Chief Judge to "adopt[] ... rules and orders regulating practice and procedure in the courts."

N.Y. Jud. Law § 211(1)(b) (McKinney 2004). To implement these rules and orders, the Chief Judge must consult with the Administrative Board, which consists of herself and the presiding justices of the appellate divisions of the supreme court, N.Y. Jud. Law § 210(2), and receive the approval of the New York Court of Appeals. N.Y. Jud. Law § 211(2).

it went into effect, began seeking legal employment. According to Kraham's complaint, the Rule prevented her from securing work as an attorney for approximately one year. Specifically, she claims she was denied three legal employment opportunities—one to form a partnership with another attorney, and two to join existing law firms—because members of the law firms did not want to become ineligible for judicial appointments. She wrote to the Office of Court Administration describing her financial hardship and seeking a waiver of the Rule, but Counsel to the Unified Court System responded that the Rule was an absolute bar that did not allow for any waivers.

Kraham filed suit in the United States District Court for the Southern District of New York, alleging that in limiting her employment opportunities because of her party leadership, the Rule violated her freedom of political association as protected by the First Amendment. The district court granted defendants' motion for summary judgment, and this appeal followed.[3] We affirm for substantially the reasons stated by the district court.

## DISCUSSION

 The freedom of association guaranteed by the First Amendment protects the right to organize into political parties. *Tashjian v. Republican Party of Conn.*, 479 U.S. 208, 214, 107 S.Ct. 544, 93 L.Ed.2d 514 (1986); *see also Green Party of N.Y. State v. N.Y. State Bd. of Elections*, 389 F.3d 411, 415 (2d Cir.2004). When evaluating a First Amendment challenge to a limitation on associational freedom, courts apply either strict scrutiny, in which case the restriction survives only if it is narrowly drawn to advance a compelling state interest, *Green Party*, 389 F.3d

at 419, or rational basis review, in which case the restriction need only be rationally related to a legitimate government interest, *Lyng v. Automobile Workers*, 485 U.S. 360, 370, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988). When a challenged regulation imposes "severe burdens" on the right to associate into political parties, it must survive strict scrutiny. *Clingman v. Beaver*, 544 U.S. 581, 586, 125 S.Ct. 2029, 161 L.Ed.2d 920 (2005); *see also Burdick v. Takushi*, 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992); *Fletcher v. Marino*, 882 F.2d 605, 611 (2d Cir.1989) (citing *Eu v. San Francisco County Democratic Cent. Comm.*, 489 U.S. 214, 222, 109 S.Ct. 1013, 103 L.Ed.2d 271 (1989)). Statutes analyzed under strict scrutiny typically involve restrictions on "the internal workings of political parties," as well as "restrictions on voters' access to the polls, [and] candidates' access to the ballot." *Fletcher*, 882 F.2d at 611. If, however, to ensure fairness in government or in the party system, the regulation affects political party participation only in a limited and incidental fashion, the restriction should be reviewed only for a rational basis. *Id.* at 612; *see also Clingman*, 544 U.S. at 587, 125 S.Ct. 2029 ("[W]hen regulations impose lesser burdens, a State's important regulatory interests will usually be enough to justify reasonable, nondiscriminatory restrictions." (internal quotation marks omitted)); *Eu*, 489 U.S. at 232, 109 S.Ct. 1013 (suggesting same).

In *Fletcher v. Marino*, 882 F.2d at 615, we upheld the constitutionality of a statute similar in character to the Rule challenged in this case. We determined that because the "Serrano Law," which prohibited certain elected or appointed political party officials from serving on community school

---

**3.** By the time of this appeal, Kraham had resigned her Co–Chair position, and the two-year post-resignation prohibition had expired.

Because Kraham seeks, *inter alia,* compensation for the one year in which she could not find employment, the case is not moot.

boards, "d[id] not control political parties or the party process" but rather "implicate[d], in a limited fashion, a person's rights to participate in politics," it warranted only rational basis review. 882 F.2d at 608, 612. Applying our reasoning in *Fletcher*, the district court in this case determined that the Rule was appropriately evaluated under rational basis review, rather than strict scrutiny. The court found that, like the Serrano Law, the Rule's restriction on court appointments imposed only an "incidental limitation" on Kraham's ability to find employment, in that it prevented her from working at certain law firms, and that this was "not a sufficient burden on the right of political association to receive the standard of strict scrutiny." *Kraham*, slip op. at 5. Because the Rule advanced New York's legitimate interest in "eliminating corruption and favoritism in the judicial appointment process," the court concluded that it withstood rational basis review. *Id*. We agree with the district court's well-reasoned analysis.

Kraham argues on appeal that the district court erred in employing rational basis review rather than strict scrutiny because, unlike the Serrano Law, the Rule interferes with an affected individual's ability to find gainful employment and not merely to serve as an uncompensated member of a community school board. She asserts both that the denial of employment opportunities is "[b]y definition ... significant" and that, in her case, the practical effect was particularly severe because she lives in a small legal community providing few employment options.

*Fletcher*, however, turned not on the severity of the plaintiffs' hardship, but on the nature of the challenged restriction. As we observed in Fletcher, regulations that have warranted strict scrutiny controlled "how the parties operated and how the parties' candidates were chosen by the people." 882 F.2d at 611. In *Tashjian*, for example, the Supreme Court, applying strict scrutiny, struck down a New York statute that prevented parties from choosing to permit independent voters to vote in their primaries, 479 U.S. at 215–16, 107 S.Ct. 544 and in *Eu*, it invalidated a law that dictated important aspects of political parties' organization and composition (including limits on the terms of office for committee chairs and a requirement that the chair rotate between residents of northern and southern California) and prohibited the parties from endorsing primary candidates, 489 U.S. at 229–30, 109 S.Ct. 1013. The Serrano Law at issue in *Fletcher*, by contrast, "neither told the parties how their leaders will be selected nor hampered the leaders' role within the party. All that it [did was] to limit such leaders' outside activities in one small aspect...." *Fletcher*, 882 F.2d at 614. While we are not insensitive to the hardship Kraham experienced because of her difficulty in finding employment, the burden fell on her "outside activities," and not on her selection as a leader or her "role within the party." *Id*. As a result, the Rule falls on the rational basis side of the line drawn in *Fletcher*.

Furthermore, the burden on Kraham's employment is no more severe than those the Supreme Court upheld in *U.S. Civil Service Commission v. National Association of Letter Carriers*, 413 U.S. 548, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973), and *Broadrick v. Oklahoma*, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973). In *Letter Carriers*, the Supreme Court upheld the Hatch Act's prohibition on federal employees' participation in a wide variety of political activities, including holding party office, 413 U.S. at 550, 556, 93 S.Ct. 2880, and in *Broadrick* it upheld a similar state statute, 413 U.S. 602, 618, 93 S.Ct. 2880. As we noted in *Fletcher*, these laws effectively prevented party officers from being

employed by the entire executive branch of the federal government (in *Letter Carriers)* or the state government (in *Broadrick*). *Fletcher,* 882 F.2d at 613–14. Given the Court's "unhesitating[ ]" approval of the Hatch Act, *Letter Carriers,* 413 U.S. at 556, 93 S.Ct. 2880, the Rule—which not only implicates a narrower range of political activity (holding political party office) but burdens a much narrower range of employment (receiving or associating with those who receive court appointments)—is unquestionably valid.

In an effort to cast the Rule as a more direct burden on associational rights, Kraham argues that it in fact controls the internal structure of political parties, in that it "chas[es] away qualified party members from leadership positions." *See* Appellant's Br. at 13. Both we and the Supreme Court, however, have been unpersuaded by similar arguments. *See Letter Carriers,* 413 U.S. 552 n. 3, 556, 93 S.Ct. 2880 (describing party committees' claims that individuals who otherwise would have become committee members had been " 'deterred' " from doing so by the Hatch Act); *Fletcher,* 882 F.2d at 614 (rejecting party members' argument that the Serrano Law interfered with their right to choose their leaders by explaining that the right "is not absolute" and that "limit[ing] such leaders' outside activities in one small aspect ... in furtherance of the rational and legitimate goal of deterring improper political influence" does not unduly interfere with it). In *Lyng v. Automobile Workers,* the Supreme Court directly confronted the question of whether a government policy that creates an economic disincentive to engage in protected associational conduct violates the First Amendment. 485 U.S. at 366–67, 108 S.Ct. 1184. The Court found that despite the fundamental right to organize into unions, a law denying food stamps to striking workers—even though "[s]trikers and their union would be much better off if food stamps were available"—"ha[d] no substantial impact on any fundamental interest" and therefore warranted only rational basis review. *Id.* at 366–68, 370, 108 S.Ct. 1184 (noting that the law "does not 'order' appellees not to associate together ... and it does not 'prevent' them from associating together" (citing *Lyng v. Castillo,* 477 U.S. 635, 638, 106 S.Ct. 2727, 91 L.Ed.2d 527 (1986))). Similarly, the Rule does force individuals like Kraham to choose between serving as a high-ranking political party leader and receiving (or associating with those who receive) court appointments. Choosing the former may have an economic consequence. This incidental effect on individual decision-making, however, furthers the rational and legitimate goal of eliminating corrupt court appointments. It does not render the Rule a direct infringement on associational rights. *See Automobile Workers,* 485 U.S. at 367, 108 S.Ct. 1184; *Fletcher,* 882 F.2d at 612–14. Though at a certain point a disincentive to party office-holding might become so severe that it effectively bars that activity altogether, the Rule's effect—like that of the laws upheld in *Fletcher* and *Automobile Workers*—falls far short of doing so.

■ Having concluded, as did the district court, that rational basis review is appropriate, we similarly agree that the Rule survives that analysis. Kraham has conceded on appeal that the interest supporting the Rule—namely, protecting the integrity and the appearance of integrity of the New York judicial system—is not merely legitimate, but compelling, and we easily find that the Rule is rationally related to that interest. Indeed, the Rule embodies precisely the recommendation made to Chief Judge Kaye by the Commission on Fiduciary Appointments, which it developed in response to concrete information about the politically motivated appoint-

ments actually occurring and about the resulting public perception that the process was compromised. *See* Commission Report at 21–26, 39–40; *see also* Special Inspector General Report at i, v-vi, 72.

 Though she concedes the importance of the interest behind the Rule, Kraham alleges that it is over-inclusive, such that a substantial portion of the burden it places on associational rights does not advance the asserted government interests. In particular, she objects that the Rule extends not just to party leaders but to their law firms, regardless of the size of the firm and the number of appointments it has received; that it continues to apply for two years after party leaders resign; and that it does not allow for waivers under any circumstances. Even under rational basis review, this challenge may bear on our analysis. *See Green Party*, 389 F.3d at 419 (describing the Supreme Court's instruction in associational rights cases to "consider the 'character and magnitude' of the alleged injury the plaintiff has sustained, and then ... identify and evaluate the interests the state uses to justify the burdens imposed by the challenged rule, taking into consideration the extent to which the state's interests make it necessary to burden plaintiff's rights" (quoting *Burdick v. Takushi*, 504 U.S. 428, 434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992))). But despite Kraham's contention otherwise, the important state interests at issue more than justify any burden the Rule imposes.

Each of the features to which Kraham objects is necessary to fulfill the objectives of the Rule. First, the Commission Report found that lucrative appointments were going disproportionately not just to party leaders, but to their law firms. *See* Commission Report at 39. Also, at the very least, appointing others in the law firms of political party leaders creates the public *perception* of favoritism in the judicial ap-

pointment process. *See id.* at 21–25. Second, the two-year post-resignation prohibition period reasonably prevents a "quick turnaround" from party leader to court appointee. This period, which is consistent with the New York Public Officers Law's limitation on the professional activities of state officers, employees, and party officers for two years after they leave office or state employment, N.Y. Pub. Off. Law § 73(8); *see* Lippman Aff. ¶ 20, is justified by the state's interest in removing from the appointment process any appearance of impropriety. Third, we agree with defendants and the State of New York as amicus curiae that permitting waivers would vitiate the Rule's very purpose—to reduce judicial discretion in the appointment process—by opening the door to politically motivated waivers and thereby creating the perception that politically motivated appointments are possible. Given that the Rule serves such a critical purpose, and was developed carefully to respond to a comprehensively documented problem, we reject Kraham's argument that the Rule imposes a greater burden than the state's interests justify.

## CONCLUSION

For the foregoing reasons, we hold that section 36.2(c)(4)(i) of the Rules of the Chief Judge of the State of New York does not violate the First Amendment, and AFFIRM the judgment of the district court.