[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
NOVEMBER 7, 2001
THOMAS K. KAHN
CLERK

————————————————

No. 00-13607

————————————————

D. C. Docket No. 99-01238-CIV-T-26E


CONNIE BURTON ,

Plaintiff-Appellant,


versus


TAMPA HOUSING AUTHORITY,
UNITED STATES OF AMERICA,

Defendants-Appellees.


————————————————

Appeal from the United States District Court
for the Middle District of Florida.

————————————————

**(November 7, 2001)**



Before ANDERSON, Chief Judge, HULL and FAY, Circuit Judges.

FAY, Circuit Judge:

## I. Introduction

The question presented by this appeal is whether or not a public housing authority may evict ignorant tenants, pursuant to a Congressional mandate, when the tenant, any member of the tenant's household, or any guest or other person under the tenant's control engages in drug-related criminal activity on or near the public housing premises. The district court answered in the affirmative. We agree and affirm.

## II. Factual and Procedural History

The facts giving rise to this case, as limited in this appeal, involve the Appellant, Connie Burton, a forty-three year-old single mother of three who has lived in Tampa Housing Authority ("THA") property for approximately sixteen years. Ms. Burton has resided at her current apartment in Robels Park for the past five years. On October 8, 1998, Ms. Burton added her adult son, Narada Burton, to her lease as a household member. This was a prerequisite to enable him to secure employment with the THA's New Beginnings program. This program was designed to employ ten first-time offenders with the THA's Department of Operations.[1] However, six months later, on April 15, 1999, Narada Burton was

---

[1]Narada Burton had been previously arrested for drug-related criminal activity.

arrested for allegedly participating in a drug transaction on THA grounds.[2] It is undisputed that the transaction did not occur in Ms. Burton's apartment, nor that she was not aware of the criminal activity at the time.

Pursuant to its "One Strike" or "Zero Tolerance" policy, as authorized by 42 U.S.C. § 1437d(l)(6),[3] the THA commenced an action to evict Ms. Burton for breach of the terms of her Dwelling Lease Agreement. Embodied within this agreement is the understanding that it is the resident's obligation to ensure that no member of the resident's household, guest, or other person under the resident's control shall engage in any criminal activity on THA premises.[4] Ms. Burton now appeals the district court's denial of her motion for summary judgment, and the

---

[2]On March 14, 2000, following a trial and a conviction, Narada Burton was sentenced to three years probation as a result of his felony conviction for his drug-related offense. He continued to reside with Ms. Burton in her THA apartment after his arrest.

[3]42 U.S.C. § 1437d(l)6) reads:
Each public housing agency shall utilize leases which–
(6) provide that any criminal activity that threatens the health, safety, or right to peaceful enjoyment of the premises by other tenants or any drug-related criminal activity on or off such premises, engaged in by a public housing tenant, any member of the tenant's household, or any guest or other person under the tenant's control, shall be cause for termination of tenancy;

[4]The relevant provision of the agreement reads:
Resident Obligations:
*Resident* agrees to be obligated as follows:
I. To assure that *Residents,* members of *Resident's* household, guests (as defined herein) or other person under *Resident's* control, shall not: (i) engage in any criminal activity, that threatens the health, safety or peaceful enjoyment of *THA's* property by other residents of *THA* or employees of *THA*; or (ii) drug-related criminal activity (as defined herein) upon or within two hundred (200) feet of *THA's* property, and such criminal activity shall be grounds for termination of this Agreement.

granting of summary judgment for THA.

III. Issues Raised on Appeal

In appealing the district court's denial of her motion for summary judgment, and the granting of summary judgment for THA, Ms. Burton raises three points of alleged error concerning the district court's interpretation of 42 U.S.C. § 1437d(l)(6). Her first ground for appeal is whether the district court erred in ruling that a local public housing authority has the right to terminate the property rights of ignorant public housing tenants when a household member engages in drug-related criminal activity on public housing authority property. Ms. Burton advocates that an "innocent party" defense should be read into the statute, while the district court held that no such defense exists. Ms. Burton's second argument is that the district court erred in holding that her due process rights were not violated by the THA. She claims that the automatic deprivation of a tenant's property interest – that is, when the property was not used in the commission of a crime and when the tenant did not know of the illegal activity – violates the due process clause. Finally, Ms. Burton alleges that the district court erred in holding that her freedom of association rights under the First Amendment were not violated. She claims that because of the one-strike policy, tenants are forced to restrict or eliminate their association with others who may potentially find themselves

4

accused of illegal wrongdoing.

## IV.  Standard of Review

We review *de novo* the district court's grant of summary judgment, applying the same standard as the district court.  See Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla., Inc., 140 F.3d 898, 905 (11th Cir. 1998).  We view all evidence and factual inferences reasonably drawn from the evidence in the light most favorable to the non-moving party.  See Korman v. HBC Fla., Inc., 182 F.3d 1291, 1293 (11th Cir. 1999).  "Summary judgment is appropriate when there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law."  McCaleb v. A.O. Smith Corp., 200 F.3d 747, 750 (11th Cir. 2000) (citing Fed. R. Civ. P. 56(c)).  "If the record presents factual issues, the court must not decide them; it must deny the motion and proceed to trial."  Clemons v. Dougherty County, Ga., 684 F.2d 1365, 1369 (11th Cir. 1982).  A grant of summary judgment may be upheld on any basis supported by the record.  See Fitzpatrick v. City of Atlanta, 2 F.3d 1112, 1118 (11th Cir. 1993).

## V.  Discussion

In discussing this case we wish to acknowledge that we are following the

lead of Judge Joseph Sneed, as set forth in his comprehensive dissent in Rucker v. Davis, 237 F.3d 1113, 1127 (9th Cir. 2001) (en banc), *cert. granted,* 70 U.S.L.W. 3036 (U.S. Sep. 25, 2001) (No. 00-1770); 69 U.S.L.W. 3764 (No. 00-1781) (Oct. 1, 2001) (consolidated). Judge Sneed's dissenting opinion develops the arguments, analyzes the relevant cases, and sets forth the line of reasoning we find most persuasive.

In the late 1980's the drug epidemic had become corrosive in many aspects of our society. Public housing areas suffered along with many other segments of our society during the drug war. In 1988, in response to the deteriorating safety and overall quality of life due to drug-related crime and violence in public housing, Congress granted to local public housing authorities ("PHAs") a "new tool" in striking a balance between providing affordable low income housing which was also safe to live in. Id. 42 U.S.C. 1437d(l)(6) was this tool, and it mandated that every lease entered into by a PHA include a provision permitting termination of tenancy when "a public housing tenant, any member of the tenant's household, or any guest or other person under the tenant's control" engaged in "drug-related criminal activity on or near public housing premises."

We believe the statutory language contained within the statute is unmistakably clear, and was based on reasonable findings that such legislation was

necessary to eradicate the unsavory element that had infiltrated the public housing complexes.  In assessing the validity of this statute, we find "nothing in the Constitution [which] prohibits the government from entering into reasonable lease provisions necessary to maintain the safety and structural soundness of its property."  Id.  "The increase in drug-related crime not only leads to murders, muggings, and other forms of violence against tenants, but also to a deterioration of the physical environment that requires substantial government expenditures."  42 U.S.C. §11901(4).  The government, given its status as a landlord, must be given the authority to maintain its property at a habitable and safe standard for all of its tenants.

In answering the question of whether an ignorant tenant may be evicted based on a household members' or guests' drug use, the Department of Housing and Urban Development, ("HUD") offers guidance.  HUD, the agency charged with administering public housing, concluded that the statute did authorize the eviction of these ignorant tenants.  24 C.F.R. § 966.4(l)(1)(B); Public Housing Lease and Grievance Procedures, 56 Fed. Reg. 51,560, 51,567 (October 11, 1991).  If this interpretation is a "permissible construction of the statute," then this court may not substitute its own judgment for that of HUD.  Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc., 467 U.S. 837, 843, 104 S.Ct. 2778, 81 L.Ed.2d 694

7

(1984). Because we find the statute to be clear on its face, HUD's interpretation is the only permissible construction of the statute. The cardinal principle of statutory construction is that "[w]here there is no ambiguity in the words, there is no room for construction." United States v. Gonzales, 520 U.S. 1, 8, 117 S.Ct. 1032, 137 L.Ed.2d 132 (1997) (quoting United States v. Wilberger, 18 U.S. 76, 95-96, 5 L.Ed. 37 (1820). In the instant case, the statute authorizes eviction when a "public housing tenant, any member of the tenant's household, or any guest or other person under the tenant's control" engages in "any drug related criminal activity." There is nothing ambiguous in this language.

Under § 1437d(l)(6), there are four categories of individuals whose drug-related criminal activity on or near public housing property will result in the tenant's eviction. A tenant can be terminated for his or her own criminal drug activity, a household member's,[5] a guest's,[6] or activity by any other person under the tenant's control. The structure of the statute suggests that all of these individuals are "*per se* under the tenant's control, and, therefore, the drug related criminal activity of anyone in one of these categories is cause for eviction."

---

[5]HUD defined "members of the household" as those individuals who are listed as such by name on the lease, as Narada Burton was in the instant case. 24 C.F.R. § 966.4(a)(2).

[6]HUD defines a "guest" as "a person in the leased unit with the consent of a household member." 24 C.F.R. § 966.4(d)(1).

Rucker, 237 F.3d at 1129 (Sneed, J., dissenting).  In this case, the plain meaning of the statute is obvious.  The eviction of ignorant tenants due to the conduct of those associated with them is supported by a "reasonable rationale based on sound public policy."  Id. at 1130.

Our interpretation and reading of the statute in question is reinforced by two related statutory provisions.  The first is 42 U.S.C. § 1437d(c)(4)(A).[7]  This statute, as it stood through 1996, mandated that PHA's fulfill three independent duties.  Under subsection (i), PHA's were required to allocate available housing units based on congressionally determined "preferences."  These preferences were given to those in need, such as the homeless, or those using more than 50% of their

---

[7]42 U.S.C. § 1437d(c) reads in relevant part:

> (4) the public housing agency shall comply with such procedures and requirements as the Secretary may prescribe to assure that sound management practices will be followed in the operation of the project, including requirements pertaining to –
> (A) ... the establishment of tenant selection criteria which –
> (i) ...  give preference to families that occupy substandard housing (including families that are homeless or living in a shelter for homeless families), are paying more than 50 percent of family income for rent, or are involuntarily displaced . . . at the time they are seeking assistance under this chapter. ...
> (iii) *prohibit any individual or family evicted from housing assisted under the chapter by reason of drug related criminal activity from having a preference under any provision of this subparagraph for 3 years* ... except that the agency may waive the application of this clause under standards established by the Secretary (which shall include) *waiver for any member of a family of an individual prohibited from tenancy under this clause who the agency determines clearly did not participate in and had no knowledge of such criminal activity* ...).  (emphasis added)

9

income to pay rent. Under subsection (iii), an individual or family otherwise eligible for preferential placement in available housing was disqualified from receiving a preference for a period of three years if evicted from public housing because of drug-related criminal activity. And finally, under the final clause of subsection (iii), PHA's were specifically required to waive the three year disqualification period for those individuals who "clearly did not participate in and had no knowledge of such criminal activity."

These provisions served three functions: 1) established preferential tenant selection criteria; 2) disqualified those evicted because of drug activity from the established preferences for a period of three years; and 3) exempted from disqualification those evicted who clearly did not participate in and had no knowledge of the criminal activity. Thus under the statutory mandate of 1437d(c)(4)(A), PHA's were required to differentiate between two classes of tenants evicted from public housing for drug-related criminal activity. The first class was disqualified from preferential placement for three years if they participated in or had knowledge of the criminal activity. The second class consisted of those individuals who were evicted for drug-related criminal activity, but did not participate in or have knowledge of that activity. These individuals were eligible to receive preferential treatment if they fit within one of the other

10

criteria listed in § 1437d(c)(4)(A)(i).

When Congress created a distinction between tenants evicted for participating in or having knowledge of the wrongdoing, and those who did not have such knowledge, clearly it did so with the understanding that an ignorant tenant could be evicted for the drug-related criminal activity of another. While ignorant tenants were granted some reprieve by the receipt of preferential treatment in the waiver of the three year prohibition, they nevertheless were still subject to eviction proceedings. "Were that not so, there would have been no need for Congress to write a statute specifically waiving the applicability of the three-year prohibition period to the ignorant tenant." Rucker, 237 F.3d at 1132 (Sneed J., dissenting).

Additionally, 21 U.S.C. § 881(a)(7) lends support to the plain language interpretation of § 1437d(l)(6).[8] It is a civil forfeiture statute that makes leasehold interests subject to forfeiture when used to commit drug-related crimes. It was

---

[8]21 U.S.C. § 881(a)(7) provides:
The following shall be subject to forfeiture to the United States and no property right shall exist in them:
(7) All real property, including any right, title and interest (including any leasehold interest) in the whole of any lot or tract of land and any appurtenances or improvements, which is used, or intended to be used, in any manner or part, to commit, or to facilitate the commission of, a violation of this subchapter punishable by more than one year's imprisonment, except that no property shall be forfeited under this paragraph, to the extent of an interest of an owner, by reason of any act or omission established by that owner to have been committed or omitted without the knowledge or consent of that owner.

11

amended concurrently with the passage of § 1437d(l)(6) as part of the Anti-Drug Abuse Act of 1988. Section 881(a)(7) specifically includes a knowledge requirement. Under it, no property otherwise subject to forfeiture may be seized if the owner establishes that the property was used in drug-related criminal activity "without the knowledge or consent of that owner."

Abiding by another canon of statutory construction, "[w]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (quoting United States v. Wong Kim Bo, 472 F.2d 720, 722 (5th Cir. 1972); United States v. Koonce, 991 F.2d 693, 698 (11th Cir. 1993). In creating a provision allowing an innocent owner to rebut the presumption of his or her participation or knowledge, Congress "clearly perceived that forfeitures of leaseholds under 21 U.S.C. § 881(a)(7) were to function differently from evictions under 42 U.S.C. § 1437d(l)(6) and legislated different regimes to govern the two." Rucker, 237 F.3d at 1132 (Sneed, J., dissenting). Because § 881(a)(7) did not provide for procedural protection to the owner, as seizure was authorized once a violation occurred, Congress recognized that additional substantive protections were needed to prevent forfeiture against

12

unknowing parties.

Similarly, in a 1989 emergency supplemental appropriation measure, Congress directed the Secretary of HUD to issue waivers of certain administrative procedures "as long as evictions of a household member involved in drug-related criminal activity shall not affect the right of any other household member who is not involved in such activity to continue tenancy." Dire Emergency Supplemental Appropriations and Transfers, Pub.L. No. 101-45 § 404, 103 Stat. 97 (1989). Much like the forfeiture statute, this measure permits the taking of property without any pre-deprivation procedural protection. Therefore, Congress included a substantive protection for innocent tenants. However, a similar substantive right was not afforded to tenants who received the full procedural protections offered by HUD and local PHAs.

"Thus the 'innocent' owner exception in both 21 U.S.C. § 881(a)(7) and Pub.L. No. 101-45 § 404 reflected distinctly different congressional judgments about the proper tradeoff between procedural and substantive protections." Rucker, 237 F.3d at 1133 (Sneed, J., dissenting). Owners were given substantive protections, while tenants were not. While Congress concluded that the forfeiture statute should not be applied to owners who did not know of or consent to the illegal use of their property, it did not afford innocent tenants the same protection.

13

In so doing, Congress granted broader authority to local PHAs in evicting its tenants than federal agents had to seize property of innocent owners in drug-related criminal activity.

After further inspection into the Congressional treatment of § 1437d(l)(6), it is apparent to us that Congress specifically considered the ramifications of the statute, and intended precisely what the plain reading of the statute entails. In a 1989 congressional hearing, for example, the associate director of the American Civil Liberties Union (ACLU) argued that PHAs should not be allowed to evict a tenant unless they could prove that a tenant had knowledge and actual control of the wrongdoer. See Drugs in Federally Assisted Housing: Hearings on S.566 Before the Subcomm. on Housing and Urban Affairs of the Senate Comm. on Banking, Housing, and Urban Affairs, S. Doc. No. 101-234, at 90-91 (1989). In that hearing, the ACLU pointed to several instances where ignorant tenants were subjected to eviction proceedings. S. Doc. No. 101-234, at 86-87; Davidson, Public Housing Aides Push to Evict Drug Users, Sometimes Violating the Rights of other Tenants, Wall St. J., Jul 6, 1989 at A12. Yet after consideration, and even after amending the eviction provision, Congress did not include an innocent owner exception. National Affordable Housing Act, Pub.L. 101-625, § 504, 104 Stat. 4079 (1990) (substituting provisions relating to criminal activity threatening

14

health, safety or peaceful enjoyment of other tenants for provisions relating to criminal activity generally). Following the lead in this decision was HUD's subsequent interpretation of 1437d(l)(6), who, contrary to the urging of legal aid at HUD's notice and comment hearings before implementing the statute, nevertheless interpreted the statute to grant discretion to PHAs to evict ignorant tenants. See 56 Fed.Reg. at 51,567.

Subsequently, Congress again amended the eviction statute, and again failed to include an innocent owner exemption. In fact the 1996 Amendment to § 1437(d)(l)(6) actually expanded the liability of an ignorant tenants. Tenants could now be evicted for drug-related criminal activity "on or off" public premises, as opposed to "on or near" the premises as the legislation had previously read. Pub.L. No. 104-120 § 9(a)(2), 110 Stat. 836 (1996). We place great significance on Congress's failure to include an innocent owner exemption. "We should not be quick to conclude that Congress either neglected to consider an issue related to its enactments or decided to avoid the issue and leave its resolution to the courts.... Instead we should search the statutory language and structure with the assumption that Congress knew what it was doing when it enacted the statute at issue." Snapp v. Unlimited Concepts, Inc., 208 F.3d 928, 936 (11th Cir. 2000); In re Griffith, 206 F.3d 1389, 1939 (11th Cir. 2000) (Congress is presumed to be aware of existing law

15

when it passes legislation).

> Likewise, in this instance, Congress was aware that the administrative agency charged with implementing the eviction provision construed it to permit eviction of ignorant tenants. This interpretation had been challenged in both policy and constitutional grounds before Congress and in HUD's notice and comment procedures. Congress itself has shown its concern for ignorant tenants by protecting them with specific language in *other* legislative enactments. See supra. Congress, however, did not provide an exemption for ignorant tenants when it amended § 1437(d)(l)(6) in 1996. This court does not have the power to amend the statute. Congress clearly intended HUD's interpretation of the eviction to prevail.

Rucker, 237 F.3d at 1135 (Sneed, J., dissenting).

Lending further credence to our holding is the rather comprehensive scheme of legislative initiatives aimed at the public housing drug crisis with which § 1437d(l)(6) is intertwined. See Anti-Drug Abuse Act of 1998, Pub.L. No. 100-690, § 5101-5105 (1988); Dire Emergency Supplemental Appropriations and Transfers, Pub.L. No. 101-15, § 404 (1989); 42 U.S.C. § 1437d(c)(4)(A) (1990). Important to this analysis is the fact that § 1437(d)(l)(6) does not mandate eviction for all tenants whose household members or guests engage in drug-related criminal activity, but rather it permits their eviction, granting discretion to the PHAs to

16

make this determination on a case-by-case basis.[9] "This was a reasonable decision on the part of Congress." Rucker, 237 F.3d. at 1135 (Sneed, J., dissenting).

In the passage of § 1437(d)(l)(6), Congress was confronted with two overriding concerns in permitting the eviction of innocent tenants. Conditions in the public housing complexes had deteriorated to such deplorable conditions due to the rampant drug use, that many of them were rendered unsafe, and in some instances, unlivable. 42 U.S.C. § 11901(3) ("drug dealers are increasingly imposing a reign of terror on public and other federally assisted low income housing tenants.") Yet, tenants were not cooperating with the efforts of local PHAs to address the drug problem, particularly because many of the tenants were part of the problem. "[W]hen suspected drug dealers were notified that eviction proceedings against them had been started, they sought to punish tenants who might have identified them." 134 Cong. Rec. E1965-02 (extended remarks of Rep. Rangel, June 14, 1998) (quoting Emmanuel P. Popolizio, At Long Last, A Victory Over Drug Dealers, N.Y.Times, May 21, 1988). As Judge Sneed points out, it was a rare factual situation to discover the tenant seated with the drug using guest.

---

[9]Local PHAs operate "with tax funds provided from federal as well as from state sources. The State...has appropriate and paramount interest and concern in seeing and assuring that the intended and proper objects of that tax-produced assistance are the ones who benefit from the aid it dispenses." Wyman v. Hames, 400 U.S. 309, 318-19, 91 S.Ct. 381, 386, 27 L.Ed.2d 408 (1971).

17

Absent this situation, the housing authority would be forced to rely on speculative evidence at best, such as hearsay, gossip and rumor. See Rucker, 237 F.3d at 1136 (Sneed, J., dissenting). Therefore, giving the housing authority the power to evict an ignorant tenant not only acts as a credible deterrent against criminal activity, it eliminates the need to happen upon the rare occurrence of joint wrongdoing, and diminshes the drug pusher's power of intimidation.

Similar to the factual situation in Rucker, Ms. Burton's son engaged in drug-related criminal activity outside of her apartment. As Judge Sneed points out, it is not likely that the tenant or the wrongdoer will admit to the fact that the tenant was aware of the drug-related criminal activity, especially since tenants and household members are often immediate family members. Hence, the only reliable source would be other residents. However, Congress concluded that other residents were equally unlikely to present the necessary testimony. "Tenants are frightened. They are scared for themselves and their children. They are afraid to report drug incidents to the PHA management and to the police because usually nothing is done by either agency." The Drug Problem and Public Housing: Hearings Before the House Select Comm. on Narcotics Abuse and Control, H.R.Rep. No. 101-1019, at 66 (1989) (summary of testimony of Nancy Brown, Chairperson, State of Connecticut Task Force on Public Housing and Drugs); "The fear of retaliation

18

makes it almost impossible to provide normal police protection." H.R. Rep. No. 101-1019, at 69 (summary of testimony of Vincent Lane, Chairman, Chicago Housing Authority).

Hence, in an effort to gain the cooperation of public housing tenants, Congress fashioned § 1437d(l)(6) as a reasonable response to the legitimate housing objective of restoring these complexes to both livable and safe places of residence. In reaching this objective, Congress was aware, such as through the aforementioned testimony, that success could only be reached by ridding these public housing units of the drug-related criminal activity, and giving the law-abiding tenants control over their living situations. With the statute's passage, Congress addressed a very critical need, and clearly expressed concerns similar to those of Mayor James P. Moran Jr. of Alexandria, Virginia, who, arguing before a Senate subcommittee, stated that the eviction provision was critical to "giv[ing] a sense of control back to the tenant leadership within communities." Drugs in Federally Assisted Housing: Hearings on S.566 Before the Subcomm. on Housing and Urban Affairs of the Senate Comm. on Banking, Housing and Urban Affairs, S. Doc. No. 101-234, at 27 (1989).

"Furthermore, a provision permitting the eviction of unknowing tenants because of the wrongdoing of their household members or guests is a common and

enforceable provision in leases between private owners of property and their tenants." Rucker, 237 F.3d at 1137 (Sneed, J., dissenting) (citing Shephard v. Dye, 137 Wash. 190, 252 P. 381 (1926); Fed.Reg. at 51,566 (Oct. 11. 1991) (The "ability of PHA or other landlord to enforce covenants relating to acts of unit residents...is a normal and ordinary incident of tenancy.") The fact that these provisions are regularly used and enforced by private parties is a testament to their reasonableness.

Solely because one of the parties to this particular lease was a government agency does not render "an otherwise prudent provision unreasonable." Rucker, 237 F.3d at 1137 (Sneed, J., dissenting).[10] There are many examples of when governments impose liability of individuals without requiring that the individual have actual knowledge of the wrongdoing. See e.g. Conn. Gen. Stat. § 52-572 (imposing tort liability on 'ignorant' parents for actions of their children); 42 U.S.C. § 9607 (property owner liable for environmental cleanup when waste was illegally by a previous owner without current owner's knowledge or consent). Thus, it is established that congressional imposition of liability without fault on individuals is not, *per se,* unreasonable. Congress was well within reason in

_____

[10]That one of the parties in this case is the government does not factor into whether or not the lease is reasonable. The constitutionality of the statute and its application is a separate question, and will be addressed below.

20

enacting § 1437d(l)(6) to combat the deteriorating livability of the public housing complexes. Housing Lease and Grievance Procedures, 56 Fed.Reg. at 51,567 ("Congress has determined that drug crime and criminal threats by public housing household members are a special danger to the security and general benefit of public housing residents warranting special mention in the law.") Therefore, Congress's determination was wholly reasonable.

We now consider Ms. Burton's constitutional claims; specifically, that the district court erred in ruling that § 1437d(l)(6) does not violate her due process or freedom of association rights. We adopt the well reasoned analysis of Judge Sneed:

> Government plays many parts. When it acts in one of its many proprietary roles (employer, purchaser, or landlord, to name a few), it must be able to enforce reasonable and germane conditions. National Endowment for the Arts v. Finley, 524 U.S. 569, 587-588, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998) ("[T]he Government may allocate competitive funding according to criteria that would be impermissible were direct regulation ... or a criminal penalty at stake.") A government employer, for example, may impose restraints on employee speech that would violate the First Amendment if imposed on an ordinary citizen. Pickering v. Bd. Of Educ. Of Township High School Dist. 205, Will County, Illinois, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968) (applying intermediate rather than strict scrutiny to dismissal of public school teacher for exercising First Amendment rights). Likewise, when the government acts to subsidize a purchase of certain

21

services but not others, there may be no constitutional implications. <u>Maher v. Roe</u>, 432 U.S. 464, 475, 97 S.Ct. 2376, 53 L.Ed.2d 484 (1977) (subsidizing childbirth, but not abortion "does not interfere" with a fundamental right, but merely "encourages" childbirth).

When managing a public housing complex, the government's role is not unlike that of an employer or purchaser. The constitution does not require the government to provide decent and safe housing to its citizens. <u>Lindsey</u>, 405 U.S. at 74, 92 S.Ct. 862 (there is no "constitutional guarantee of access to dwellings of a particular quality.") The rights provided in the Housing Act of 1937 and its subsequent amendments arise from congressional notions of sound policy not constitutional necessity. In furtherance of such policy, Congress should be accorded considerable flexibility in fixing the necessary rules with which beneficiaries must comply.

In this case, Congress has limited the right to reside in public housing to those individuals who agree to accept responsibility for the drug-related criminal activity of their household members and guests. It has granted to PHAs the authority to withdraw this benefit from those who will not or cannot prevent their guests from engaging in such activity. So long as this condition is relevant to the government's underlying interest as a landlord, it is constitutionally permissible. <u>Nollan v. Cal. Coastal Comm'n</u>, 483 U.S. 825, 836, 107 S.Ct. 3141, 97 L.Ed.2d 677 (1987) (if governmental purpose is sufficient to justify outright refusal of benefit, it is sufficient to justify conditions on that benefit). <u>See also</u> <u>Dandridge v. Williams</u>, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

In <u>Lyng v. Int'l Union, United Auto., Aerospace and Agric. Implement Workers of America, UAW (UAW")</u>, 485 U.S. 360, 108 S.Ct. 1184, 99 L.Ed.2d 380 (1988), the Supreme Court upheld the denial of food stamps to an entire household because a single member of that household was on strike. Like the tenants in the

22

present case, the appellees in UAW argued that the statute unconstitutionally burdened the right to association because it "impermissibly directs the onus of the striker's actions against the rest of the family." UAW, 485 U.S. at 363, 108 S.Ct. 1184.

The denial of food stamps undoubtedly imposed a hardship on "innocent" family members. So long as non-striking family members continued to share their household with a striker, they were prohibited from enjoying a government benefit to which they were otherwise entitled. Although the Court recognized that associational rights were implicated by the food stamp statute, it held that the "withdrawal of a government benefit" did not pose a significant danger to the exercise of that constitutional right. Id. at 367 n.5, 108 S.Ct. 1184.

In UAW, the Court also acknowledged that the means used by Congress in addressing this objective were imperfect because the "statute works at least some discrimination against strikers and their households." Id. at 371-72, 108 S.Ct. 1184 ("in terms of the scope and extent of their ineligibility for food stamps, § 109 is harder on strikers than voluntary quitters.") Nevertheless, the Court deferred to the congressional view of "what constitutes wise economic or social policy" and upheld the statute. Id. at 372, 108 S.Ct. 1184 (quoting Dandridge v. Williams, 397 U.S. at 486, 90 S.Ct. 1153.)

Rucker, 237 F.3d at 1138-1139 (Sneed, J., dissenting).

Similarly in Califano v. Jobst, 434 U.S. 47, 98 S.Ct. 95, 54 L.Ed.2d 228 (1977) the Supreme Court rejected a constitutional challenge to a provision of the Social Security Act. 42 U.S.C. §§ 402(d)(1)(D) and 402(d)(5) provided that a

disabled child who was a beneficiary of social security benefits was entitled to continue to receive those benefits if he or she married someone who also received such benefits. However, if the disabled child married someone not entitled to these benefits, even if the spouse was a disabled person unable to provide the beneficiary with support, the benefits were terminated. In validating this provision, the Court stated that Congress' decision to use simple criteria, such as age and marital status, was rational. Furthermore, the Court stated that a case-by-case inquiry requiring individualized proof was unnecessary. "General rules are essential...even though such rules inevitably produce seemingly arbitrary consequences in some individual cases." Id. at 53 (quoting Weinberger v. Salfi, 422 U.S. 749, 776 95 S.Ct. 2457, 45 L.Ed.2d 522 (1975). The Court found the scheme did not interfere with an individual's freedom to make a decision as important as marriage, and was "unquestionably valid." Id. at 54.

In Chavez v. The Housing Authority of the City of El Paso, 973 F.2d 1245 (5th Cir. 1992), the Fifth Circuit considered a similar provision to the one Ms. Burton now challenges. In Chavez, the representative of the class action was evicted because of her adult child's violent acts on the premises.[11] In responding

---

[11]Although Chavez had removed her son from the lease before the infraction, she was still subject to the lease's eviction penalties because her son was determined to be a guest, and this fell within the ambit of the lease's regulations, just as the provisions of § 1437(d)(l)6) provide. Hence, any distinction between the case in Chavez and that of Ms. Burton is inconsequential.

to the argument that the lease violated her First Amendment right to freedom of association, the court upheld the district court's finding that the parent-child relationship had nothing to do with the eviction decision. The court went on to say that there was nothing that demonstrated how enforcement of the lease impermissibly interfered with her right to associate with her family. There was no showing that the regulation at issue "burden[ed] a fundamental right by 'directly and substantially' interfering with family living arrangements." Id. at 1248 (quoting Lying v. Castillo, 477 U.S. 635, 638, 106 S.Ct. 2727, 2729, 91 L.Ed.2d 527 (1986). Similarly, this Court can find no merit in the claim that Ms. Burton's freedom to associate with her son, any other family member, or acquaintance is burdened by the application of § 1437d(l)(6).

> In this case, the government has interrelated interests. Both reclaiming public housing from an epidemic of drug related crime and violence and empowering public housing residents to assist in this effort are indisputably legitimate objectives. The failure to distinguish between the knowing and unknowing tenant need survive only minimal scrutiny. In determining who may reside in federally subsidized housing, Congress must draw distinctions "in order to make allocations from a finite pool of resources." UAW, 485 U.S. at 373, 108 S.Ct. 1184. See also Wyman v. James, 400 U.S. 309, 91 S.Ct. 381, 27 L.Ed.2d 408 (1971) (holding that the government may condition welfare payments on a recipients agreement to permit warrantless homevisits by agency personnel).
> Section 1437d(*l*)(6) facilitates the eviction of truly

culpable tenants, creates incentives for all tenants to report drug-related criminal activity, and provides a credible deterrent against criminal activity. Because the eviction provision is discretionary, the provision also motivates tenants to accept remedial actions short of eviction. HUD, One Strike and Your Out Policy in Public Housing, 8 (March 1996).[12]The statute is, therefore, rationally related to Congress' legitimate objectives. No more is required. Ohio Bureau of Employment Servs. V. Hodory, 431 U.S. 471, 491, 97 S.Ct. 1898, 52 L.Ed.2d 513 (1977) (statute that "provides only rough justice ... is [nevertheless] far from irrational.")

Rucker, 237 F.3d at 1139-1140 (Sneed J., dissenting).


VI. Conclusion

While we acknowledge the potential for unfairness as a result of the Congressional authorization to evict ignorant tenants, we find that this is a necessary and just means of attaining a legitimate government objective. Public housing had deteriorated to unsafe and unlivable conditions, and Congress needed a remedy to eradicate the harmful element that had infiltrated these complexes. In bestowing discretion to public housing authorities, Congress acted rationally and well within its powers. We will not weaken the Congressional authority given to

---

[12] "Even though the "one strike" policy was implemented eight years after the passage of § 1437d(l)(6) it still may offer a legitimate rationale for the passage of the statute. Atonio v. Wards Cove Packing Co., 10 F.3d 1485, 1494 (9th Cir. 1993) ("A rational basis need not be one that actually motivated Congress. It is enough that plausible reasons for Congress' action exist." [citations omitted])" (quoting Rucker, 237 F.3d at 1140, n.15 (Sneed, J. dissenting).

local housing authorities by writing into the statute an "innocent party" defense when the clear and unambiguous language of the statute is devoid of such. The authority that has been granted does not violate the Constitution. We therefore affirm the district court in all respects.

AFFIRMED