[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 19-11613
Non-Argument Calendar

_____

D.C. Docket No. 1:17-cv-00243-SCJ

HIS HOUSE RECOVERY RESIDENCE, INC.,
a Georgia not-for-profit corporation,
KEVIN WEIKUM,

Plaintiffs-Appellants,

versus

COBB COUNTY, GEORGIA,
a political subdivision of the State of Georgia,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(March 26, 2020)

Before WILSON, WILLIAM PRYOR, and JILL PRYOR, Circuit Judges.

PER CURIAM:

This is a housing discrimination case brought under both the Fair Housing Act (FHA) and the Americans with Disabilities Act (ADA).  It was brought by His House Recovery Residence, Inc. and its founder, Kevin Weikum (collectively, His House), against Cobb County, Georgia (the County).  Before the district court, the parties filed cross-motions for summary judgment.  The district court denied His House's motion for summary judgement and denied in part and granted in part summary judgment in favor of the County.  On appeal, His House alleges that the district court erred in two ways.  First, His House asserts that the district court improperly concluded that it did not sufficiently establish a disparate treatment claim because it failed to provide evidence of non-recovering people being treated differently.  Second, His House argues that the district court erred when it found that the County ordinance at issue is facially neutral.  After a thorough review of the record and the parties' briefs, we affirm.

## BACKGROUND

We recount only the essential facts.  His House operates sober-living residences in which clients voluntarily choose to participate in a substance-free, communal-living environment.  At least one of these residences is in an area of the County that is zoned for single-family, residential use—a classification that includes "group home" as a permitted use.

Under the County's Code of Ordinances, a group home is

2

a dwelling unit . . . shared by four or fewer persons, excluding resident staff, who live together as a single housekeeping unit and in a long term, family-like environment in which staff persons provide care, education and participation in community activities, under a structured and scheduled plan that must be provided to the county, for the residents with the primary goal of enabling the residents to live as independently as possible in order to reach their maximum potential under the direction and guidance of a designated managing caregiver, designated as such by the affiliate organization, who must be a resident of the group home and available by telephone on a 24-hour basis in case of complaints. A copy of the home rules shall be provided to the county as well as (if applicable) evidence of active enforcement under the Georgia Association of Recovery Residence [(GARR)] standards. The schedule of activities may be verified via periodic inspection by community development staff . . . . A group home shall not allow use of the dwelling as a home for individuals on parole, probation, or convicted and released from incarceration . . . . A group home may include a home for the disabled.

COBB COUNTY, GA., CODE OF ORDINANCES ch. 134, art. 1, § 134-1 (2019) (the Ordinance).  The current definition of "group home" was enacted in 2010, after a collaborative effort with GARR.  Before 2010, recovery residences were considered halfway houses and could not qualify as group homes.  The Ordinance now allows recovery residences to qualify as group homes where the relevant conditions of the County's zoning ordinance are met.

In the County, reasonable accommodations may be sought through the Temporary Land Use Permit (TLUP) process.  TLUPs allow for the use of a property that is otherwise prohibited under the County's zoning ordinance.  For example, for His House to house more residents than the Ordinance allows, it would need to seek a TLUP.

In 2013, His House began housing residents at 1793 Miller Drive (Miller Drive). In December 2014, His House was cited by the County for illegally occupying a single-family dwelling because it exceeded the number of allowed residents. In January of 2015, the County issued a criminal citation to Weikum for violation of the Ordinance. His House hired counsel and, in April 2015, applied for a TLUP that, in part, requested that His House be allowed to exceed the number of allowed residents.

County staff recommended denial of His House's TLUP noting, in part, that "[h]aving a multitude of people living on a property starts to erode the low intensity character of a residential neighborhood and could have a negative effect on the property values." In early June of 2015, the County Planning Commission held a hearing on His House's TLUP application. Concerns expressed by Planning Commission members included His House's lack of oversight and the number of people that would be residing on the property. The Planning Commission recommended denial of His House's TLUP application, but the ultimate decision lay with the County's Board of Commissioners (the Board).

Following the Planning Commission hearing, but before His House's hearing before the Board, the County's Code Enforcement Manager, Jerry Lanham, sent County Commissioner JoAnn Birrell an email. In that e-mail, Lanham stated that he wanted to make Birrell "aware of some of [his] concerns

4

about" His House's TLUP application. After Lanham documented His House's history of violations at another location on Latimer Lane, he expressed concern that His House "is starting off the same way [it] did at 19 Latimer Lane" and that "based on [its] past performance this will become an issue for the neighborhoods surrounding this property."[1]

About two weeks after the Planning Commission hearing, the Board considered His House's TLUP application. The application was met with opposition from citizens whose concerns included Miller Drive's proximity to a school and playgrounds and the effect of a group home on property values. The neighborhood association that encompassed Miller Drive introduced a petition that contained 60 signatures and complained of a recent increase in vandalism and drug paraphernalia in the neighborhood.

Birrell questioned His House during the meeting, asking about its prior residences as well as other current residences. Before she moved to deny the application, she said

> I've heard the concerns of the neighbors today . . . . I do have concerns
> with this being in a residential area and the close proximity of the school
> and there is a history here with a previous location, and I would just
> like to recommend to the neighbors: if anyone, no matter where you
> are, approaches your child or anything suspicious in your
> neighborhood—you need to call 911. So, sorry, but I just had to say

---

[1] His House had previously operated a recovery residence on Latimer Lane, where it was also cited for allowing an excess number of adults to reside at the residence.

that. And so with that, I would like to make a motion that would deny this application. And should this motion to deny pass, I would like to direct code enforcement to be on the property within the next thirty days to enforce compliance.

Another commissioner offered an amendment to the motion to include the Planning Commission's and County staff's recommendations to deny the application.

The Board denied the application and gave His House 30 days to reduce the number of residents at Miller Drive. After the denial, Birrell continued to follow up with County officials to see if notice had been provided to Miller Drive and if Code Enforcement would be going to Miller Drive. After His House reduced the number of residents, Code Enforcement continued to monitor and cite violations for unrelated issues at the property.

## DISCUSSION

We review a district court's grant of summary judgment de novo, viewing "all evidence and factual inferences reasonably drawn from the evidence in the light most favorable to the non-moving party." *Burton v. Tampa Hous. Auth.*, 271 F.3d 1274, 1276–77 (11th Cir. 2001). Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). This standard means "that the mere existence of *some* alleged factual dispute between the parties will not

6

defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

## I.

First, His House argues that the district court erred when it granted summary judgment on its disparate treatment claim.[2]  We have said that a disparate treatment claim "requires a plaintiff to show that he has actually been treated differently than similarly situated non-handicapped people."[3]  *Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1216–17 (11th Cir. 2008) (affirming summary judgment on an intentional discrimination claim where the owner of halfway houses failed to establish disparate treatment because there was no evidence that the city failed to enforce the statute against non-recovering substance abusers); *see also Hunt v. Aimco Props., L.P.*, 814 F.3d 1213, 1224–25 (11th Cir. 2016) (determining that a tenant plausibly alleged disability discrimination based on disparate treatment

---

[2] Based on His House's allegations, the district court treated their intentional discrimination claim as one for disparate treatment.  We do the same.

[3] His House argues that the district court erred by failing to apply the factors considered in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266–68 (1977).  We are not persuaded by this argument because *Arlington Heights* does not limit our inquiry to only the factors listed in that case, nor does it mandate a mechanical approach in discrimination claims.  The considerations the Supreme Court offered were not intended to be exhaustive.  *Id.* at 268.  Instead, the Court listed merely some of the "subjects of proper inquiry in determining whether racially discriminatory intent exist[s]."  *Id.*  In any event, even if we had probed the County's actions using the *Arlington Heights* factors, we would still affirm for the reasons we state below.

because the tenant alleged various treatments, conditions, and restrictions placed on her disabled child, but not other residents).  Disparate treatment may be proved using either direct or circumstantial evidence.  *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266 (1977).  When a plaintiff establishes discrimination through direct evidence, our inquiry ends there.  *See Massaro v. Mainlands Section 1 & 2 Civic Ass'n, Inc.*, 3 F.3d 1472, 1476 n.6 (11th Cir. 1993). We analyze circumstantial evidence using the burden-shifting framework provided in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), which requires a plaintiff to first make a prima facie case of discrimination.  *See Massaro*, 3 F.3d at 1476 n.6.

In its brief, His House asserts that it has presented both direct and circumstantial evidence of disparate treatment sufficient to survive summary judgment.  We do not believe that His House has proffered direct evidence of disparate treatment as none of the instances and allegations described in its brief can fairly be described as "evidence, which if believed, proves existence of fact in issue *without inference or presumption.*" *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 n.6 (11th Cir. 1987) (alternation accepted).  Instead, His House's allegations are more appropriately described as suggesting discrimination and, by definition, are circumstantial evidence.  *See id.*

8

His House specifically argues that the legislative history of the Ordinance, the County's prior actions at Latimer Lane, the County's alleged departure from its normal code enforcement efforts, animus from neighbors, and Commissioner Birrell's comments, are all evidence of discrimination.  We disagree because His House fails to provide sufficient evidence that the County treated them differently from similarly situated non-disabled citizens.  The fact that the Ordinance was amended as a result of a complaint by an advocacy group does not, without more, prove that His House has been treated differently than similarly situated non-recovering people or that there was discriminatory intent behind the amendment.  That the County previously cited the Latimer Lane residence is unpersuasive evidence for the same reason—His House does not offer evidence that the County unevenly enforced the Ordinance.  The record is also bereft of evidence that the County departed from its normal code enforcement procedures when it cited His House's residence at Miller Drive.  While the record is clear that some neighbors were opposed to His House's presence on Miller Drive, "evidence that neighbors and city officials are biased against recovering substance abusers is irrelevant absent some indication that the recoverers were treated differently than non-recoverers."  *See* Schwarz, 544 F.3d at 1216.  There is no such evidence here.  And regardless, His House still fails to provide evidence that the "members of the [Board] were aware of the motivations of the private citizens" or that, despite these

9

motivations, the Board was not justified in denying the TLUP. *See Hallmark*, 466 F.3d at 1284. As for Commissioner Birrell's comments, while we understand why His House might view them as unfair and unwarranted, those comments do not clearly evidence discriminatory intent. Therefore, the district court did not err in granting summary judgment on the disparate treatment claim.

## II.

His House further argues that the Ordinance is facially discriminatory. According to His House, the Ordinance discriminates because it (1) limits group homes to four or fewer residents; (2) demands that group homes have an in-resident caregiver who is available on a 24-hour basis; (3) requires "active enforcement of the [GARR] rules"; (4) prescribes "periodic inspections by County enforcement staff; and (5) prohibits persons on parole or probation who are also in recovery from residing in a group home. The effect of these criteria, His House suggests, is to single out disabled individuals and "limit[] recovering individuals' ability to obtain and maintain housing."

We disagree. For this claim to have survived summary judgment, the Ordinance, on its face, would need to discriminate against people with disabilities. But the Ordinance, does not, on its face, treat recovering individuals any differently than non-recovering individuals. None of the Ordinance's provisions distinguish based on the presence of disability. The limitation on the number of

residents applies to all group homes, as do the requirement that group homes have a resident caregiver, the provision allowing review of the schedule of activities by periodic inspections, and the prohibition against persons on parole or on probation. And we reject His House's remaining contention that the Ordinance requires "active enforcement" of the GARR rules by recovery group homes, because the Ordinance only requires such enforcement "*if applicable*." Therefore, the Ordinance is facially neutral.

* * *

In sum, the district court did not err because His House has not presented either direct or circumstantial evidence of disparate treatment and the County's ordinance is facially neutral. The judgement of the district court is therefore **AFFIRMED.**